UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE COMMODITY EXCHANGE, INC.
SILVER FUTURES AND
OPTIONS TRADING LITIGATION

1:11-md-02213-RPP

## CONSOLIDATED CLASS ACTION COMPLAINT

**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900
(212) 719-4677 (fax)

*Interim Plaintiffs' Lead Counsel*

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
(212) 907-0700

**HAUSFELD LLP**
1700 K Street N.W., Suite 650
Washington, D.C. 20006
(202) 540-7200

**LOWEY DANNENBERG COHEN
& HART, P.C.**
One North Broadway
White Plains Plaza, 5th Floor
New York, New York 10601
(914) 997-0500

**COHEN MILSTEIN SELLERS
& TOLL**
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Members, Interim Plaintiffs' Steering Committee*

Plaintiffs complain, on knowledge as to their own conduct, of Defendants

(see ¶¶22-29) as follows:[1]

## SUMMARY OF ALLEGATIONS

1.  **Unlawful conduct.** (a) On June 26, 2007 and between March 17,

2008 and October 27, 2010 ("Class Period"), Defendants combined, conspired and

agreed to restrain trade in, fix, and manipulate prices of silver futures and options

contracts traded in this District on the Commodity Exchange Inc. ("COMEX")

division of the New York Mercantile Exchange ("NYMEX").  Defendants thereby

have violated Section 1 of the Sherman Act, 15 U.S.C § 1.

(b) Also during the Class Period, certain of the Defendants, including

JP Morgan (as defined in ¶¶22-25), have intentionally acted to manipulate prices of

------

[1]Plaintiffs' information supporting their allegations made on information and belief include: (a) reports of statements by Commodity Futures Trading Commission ("CFTC") Commissioner Bart Chilton that the silver market has been and is being manipulated; (b) public news reports about the investigation by the CFTC of manipulation in the silver market; (c) news reports of JP Morgan's recent decision to close trading operations; (d) reports showing the recent reduction in the concentration of open interest in the silver futures contracts held by commercial firms; (e) reports of silver and gold prices and silver futures and silver options prices; (f) reports of trading activity, open interest and other aspects of silver futures, and silver options trading; (g) webcasts and statements of the March 25, 2010 Meeting of the CFTC to Examine Futures and Options Trading in the Metals Markets; (h) the following public reports: CFTC Commitment of Traders Reports; CFTC Bank Participation Reports; Bank For International Settlements OTC Derivatives Market Reports; Comptroller of the Currency Quarterly Reports On Bank Trading and Derivatives Activities; and the CFTC May 13, 2008 "Report on Large Short Trader Activity In the Silver Futures Market."; and (i) other investigation including that reflected in specific allegations.

COMEX silver futures and options contracts.  Such conduct violates Section 9(a)

of the Commodity Exchange Act, 7 U.S.C § 13b.

2.    **Purpose and Means**.  Defendants have effected their foregoing

restraint of trade and manipulation in order to profit themselves. Defendants have

caused declines in the price of COMEX silver, and COMEX options, and also

stabilized such prices through diverse means. These means include (a) a dominant

and manipulative short position and market power manipulation; (b) repeated

manipulative and uneconomic trades and trade manipulation; (c) false trades made

to facilitate a trade manipulation; and (d) other acts.

3.    **Market Power Manipulation**.  (a) JP Morgan, gradually acquired

control, between March 17, 2008 and August 2008, of an enormously large ounce

short position in COMEX silver futures and silver that previously was held by Bear

Stearns. *See* Factual Allegations II.B.2 *infra*.  This short position and JP Morgan's

existing COMEX short silver positions gave JP Morgan substantial market power

in COMEX silver futures contracts.

(b) For example, by August 15, 2008, JP Morgan held significantly

more net short COMEX silver positions than the next three largest traders on

COMEX combined.  JP Morgan frequently held 24-32% of the open interest in **all**

COMEX silver futures short contracts then trading.  Moreover, JP Morgan also

sometimes held 30-40% of the short open interest in the important COMEX silver futures contracts expiring in the "front" months.

(c) As JP Morgan gradually acquired its total control of these large COMEX short positions, and thereafter, COMEX silver prices substantially decreased and substantially underperformed COMEX gold prices.

(d) Conversely, when the control resulting from JP Morgan's concentrated short position in COMEX silver futures began to decline substantially after the CFTC's March 25, 2010 public hearing on manipulation, COMEX silver prices snapped back and substantially outperformed COMEX gold futures prices.

4.    **Manipulative and Uneconomic Trades**.  (a) During the Class Period, JP Morgan also made large manipulative trades that repeatedly caused sudden, unreasonable and artificial fluctuations in COMEX silver prices which profited JP Morgan. *E.g.,* Factual Allegations II.B.1 and 4 *infra*.

(b) One of these episodes occurred on August 14 and 15, 2008.  JP Morgan's trades caused a very large decline of almost $1.41 per ounce, or approximately 12%, in COMEX silver futures. This represented an approximately $220,000,000 increase in the value of JP Morgan's COMEX silver short positions.

(c) Another of these occurred on June 26, 2007.  See Factual Allegations II.B.1 *infra*.

3

5.     **Large Uneconomic Sales To Depress Prices**. Although June 26,
2007 and August 15, 2008 were extraordinary days that stand out, Plaintiffs do not
allege that JP Morgan's large manipulative trades were limited to these very
notable dates.  On the contrary, during the regime of JP Morgan's dominant
COMEX short position, the COMEX silver futures market was plagued by the
following pattern of uneconomic conduct.  Large sell orders hit the COMEX silver
futures market and moved COMEX prices down sharply. Factual Allegations
II.B.1, 3, 4, 5, and 7. This frequently happened during a time of day when there
was very low or no COMEX trading.  This conduct is wholly contrary to the
economic and rational investment conduct of selling gradually to receive the best
price for a sale.  This causes lower COMEX prices than one would receive if one
gradually sold reasonable amounts especially during the more active trading times
of day.

6.     Selling large amounts in a compressed time period, especially during
an illiquid (or low trading) time of day, is a classic manipulative device to
intentionally depress prices. These large uneconomic trades did cause the prices of
silver in the COMEX market to be lower than they otherwise would have been
during the Class Period.

7.     **CFTC Commissioner Comment**.  (a) Such depressions of the prices

4

of COMEX silver futures through large uneconomic trades greatly benefited JP Morgan's extraordinarily large COMEX short position.

(b) Specific examples of these uneconomic trades were reported to CFTC Commissioner Bart Chilton during 2009-2010.  This includes by a market professional who is registered with the National Futures Association and has been a long time participant in the COMEX silver futures markets.  Factual Allegations II.B.5 *infra*.

(c) Also, these types of trades were reported to the CFTC by other persons.  *Id.*  Plaintiffs further specifically allege that Commissioner Bart Chilton made public statements, including on October 26, 2010, to the effect that he believed there had been manipulation or related unlawful conduct in the COMEX silver futures market.

> "I believe that there have been repeated attempts to influence prices in the silver markets.  There have been fraudulent efforts to persuade and deviously control that price.  Based on what I have been told by members of the public, and reviewed in publicly available documents, I believe violations to the Commodity Exchange Act (CEA) have taken place in silver markets and that any such violation of the law in this regard should be prosecuted."

Bart Chilton, *Statement at the CFTC Public Meeting on Anti-Manipulation and Disruptive Trading Practices,* October 26, 2010. *See* ¶¶ 122-129 *infra*.

(d) Many other instances of this large manipulative selling occurred

throughout the Class Period.  Factual Allegations II.B.7.

(e) Based on the facts and circumstances alleged herein, it is plausible that JP Morgan made many of these large uneconomic trades alleged in II.B.3, 5 or 7.

8.     **Saxo Combination**.   More than twenty five additional instances of this manipulative selling occurred following the appearance of a highly unusual fake trade on the Saxo Bank silver and FOREX trading Platform.  *See* Exhibit A. JP Morgan and Deutsche Bank assisted Saxo in providing this trade platform. II.B.7 *infra*.  However, this Saxo trade platform repeatedly published a fake trade through March 2010 that did not appear on trade platform e-Signal.  See Ex. A.

9.     It was highly unusual for Saxo Bank to let a fake trade repeatedly appear on the Saxo Bank platform.  *See* II.B.7 *Infra*.

10.    In fact, the fake trade consistently appeared at the same time of day.  This was between 5:45 p.m. and 6:00 p.m. when there was a lull in trading.

11.    Moreover, the price of the fake trade was far removed from the immediate remainder of the other trades.  Third, every fake trade involved a violent down drop that appeared on the chart and immediately returned.

12.    The individual and cumulative effect of the more than twenty five plus COMEX price drops that occurred after the Saxo signal, was to cause

COMEX prices to be lower than they otherwise would have been.

13.      **Coordination**. Further, JP Morgan had other relationships.  For example, JP Morgan's silver trader who, when he was with Bear Stearns, helped create the large COMEX short position, had joined JP Morgan by June or July 2008.  After joining JP Morgan, this trader then regularly communicated with the head silver traders at HSBC. *See* II.B.2 and 3.

14.      **"During-After" Comparisons**.  (a) During the Class Period, from March 17, 2008 until March 25, 2010, when the CFTC held a hearing related to the manipulation of COMEX silver futures prices, COMEX silver prices greatly underperformed COMEX gold prices; the price of COMEX gold increased by approximately 9% but the price of COMEX silver futures **decreased** 17%.  But after the threats by the public government hearing on March 25 to expose anyone manipulating silver, this prior relationship dramatically reversed.  Specifically, COMEX silver prices increased by approximately 40% from March 25, 2010 to October 27, 2010.  No fundamental changes in supply or demand for silver, including industrial demand, occurred during this time period.  Gold prices increased by only 21% during this time period.

(b) The foregoing "price signature" of manipulation is not explainable by any changes in supply and demand.  This "price signature" directly results, at

least in substantial part, from the increase in JP Morgan's COMEX short silver futures positions and the increase in Defendants' manipulative acts during the March 17, 2008 – March 25, 2010 period, followed by JP Morgan's decrease in the concentration of its large short position and additional reductions in JP Morgan's unlawful activities in the COMEX silver market after the March 25, 2010 public government hearing on manipulation.

15.    As a direct result of Defendants' unlawful conduct alleged herein, the prices of COMEX silver futures and options were artificial during the Class Period and Plaintiffs and members of the Class suffered losses, were injured in their property, and suffered actual damages.

## JURISDICTION AND VENUE

16.    Silver is a "commodity" and is the "commodity underlying" silver futures and options contracts traded on the COMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

17.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

18.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. 25, and 28 U.S.C. §§ 1331 and 1337.

19.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the prices of COMEX silver (sometimes, "silver") contracts which were traded in this District in which COMEX is located, at One North End Avenue, New York, New York. As used herein, COMEX silver contracts means COMEX silver futures contracts, and COMEX options on such contracts.

20.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

21.     During the Class Period, the named Plaintiffs hereto transacted in COMEX silver futures and options contracts and lost money and were injured in their property as a result of Defendants' unlawful conduct.

a.  Plaintiff Alan J. Antin transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct. This includes losses on June 26, 2007 in the July 2007 and September 2007 COMEX silver contracts, and on August 15, 2008 in the September 2008 COMEX silver contract.

b.  Plaintiff Blackbriar Holdings, LLC transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

c.  Plaintiff CLAL Finance Mutual Fund Management, Ltd. transacted in COMEX silver futures and options contracts during the Class Period and was injured in its property as a result of Defendants' unlawful conduct.

d.  Plaintiff Steven B. Crystal transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

e.   Plaintiff Steven B. Crystal Trustee for the Estate of Norman S. Crystal transacted in COMEX silver futures and options contracts during the Class Period and was injured in their property as a result of Defendants' unlawful conduct.

f.   Plaintiff Crystal Investment Partners LLC transacted in COMEX silver futures and options contracts during the Class Period and was injured in its property as a result of Defendants' unlawful conduct.

g.   Plaintiff Christopher DePaoli transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

h.   Plaintiff Paul Feldman transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct. This includes losses on August 15, 2008 in the December 2008 COMEX silver contract.

i.   Plaintiff Gamma Traders I, LLC transacted in COMEX silver futures and options contracts during the Class Period and was injured in its property as a result of Defendants' unlawful conduct.

j.   Plaintiff Rebecca A. Hougher transacted in COMEX silver futures and options contracts during the Class Period and was injured in her property as a result of Defendants' unlawful conduct.

k.  Plaintiff Dr. Robert Hurt transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

l.  Plaintiff Paul D. Kaplan transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

m. Plaintiff Gordon Kost transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct. This includes losses on August 15, 2008 in the December 2008 COMEX silver contract.

n.  Plaintiff Teresa Kuhn transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

o.  Plaintiff Shawn Kuo transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

p.  Plaintiff Carl F. Loeb transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

12

q.  Plaintiff Kevin J. Maher transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

r.  Plaintiff Eric Nalven transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

s.  Plaintiff J. Scott Nicholson transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

t.  Plaintiff Robert Nepo transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.  This includes losses on June 26, 2007 in the July 2007 COMEX silver contract.

u.  Plaintiff Marlene Stulbach transacted in COMEX silver futures and options contracts during the Class Period and was injured in her property as a result of Defendants' unlawful conduct.

v.  Plaintiff Keith Wagner transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

13

w. Plaintiff Wayne W. Willetz transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

x. Plaintiff Vincent Yacavino transacted in COMEX silver futures and options contracts during the Class Period and was injured in his property as a result of Defendants' unlawful conduct.

22.    Defendant JP Morgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JP Morgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

23.    Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear Stearns Securities Corp. is a Delaware corporation with its corporate offices in Brooklyn, New York. JPMC is a subsidiary of J.P. Morgan Securities Inc. which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMC is a registered Futures Commission Merchant with the CFTC.

24.    Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York. JPMS is a wholly owned subsidiary of JPMorgan Chase & Co. JPMS, through JPMC,

provides securities and futures clearing, customer financing, securities lending and related services.

25.   Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York. JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co. JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and commodity asset classes. JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

26.   Plaintiffs have entered into a tolling agreement with HSBC Holdings plc ("HSBC Holdings"), HSBC Securities (USA) Inc. ("HSBC USA"), and HSBC Bank USA, National Association ("HSBC NA").  They are not named as Defendants in this amended complaint.

27.   John Doe Defendants 1-10 are persons, whose identities are presently unknown to Plaintiffs, who performed, participated in, furthered, and/or combined conspired or agreed with JP Morgan to perform the unlawful act alleged herein, including acting as JP Morgan's broker in the restraint of trade, fixing of prices, and manipulation of silver futures and silver options traded on the COMEX.

15

28.    John Doe's 11-20 are persons who manipulated or aided and abetted the manipulation of COMEX silver futures prices as alleged herein.

29.    As used herein, Defendants refers to the John Doe Defendants and the JP Morgan Group Defendants.  As used herein, JPMorgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc. and J.P. Morgan Futures Inc. are sometimes collectively referred to as "JP Morgan" or "JPM"

## FACTUAL ALLEGATIONS

### I.    Background

30.    Wholly unlike the securities markets, in the commodity futures market (a) more than 99% of the contracts do not result in delivery and may remain open for multi-month periods with no delivery of the commodity, and (b) at any given time, one-half of the participants in the futures market are "short" and one-half of the participants are the buyers of a contract or "long".

### A.    Overview of COMEX Silver Futures and Options Contracts

31.    Silver futures contracts and silver options contracts are traded on COMEX.

32.    COMEX, a division of the New York Mercantile Exchange ("NYMEX"), has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  COMEX submits to the CFTC various rules

16

and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver. COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

33.    COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed. Typically, there are approximately twenty COMEX futures contracts trading at any given time. Trading is conducted for delivery during the current calendar month; the next two calendar months; any January, March, May, and September falling within a 23-month period; and any July and December falling within a 60-month period beginning with the current month. The "soonest" two expirations are referred to as the "front" months, and are the most actively traded months.

34.    A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future. The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

17

35.    Trades of silver futures contracts on the COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery.  The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery.  If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery."  That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver. Longs must take delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month.  The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

36.    Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities.  Instead, traders generally offset their futures positions before their contracts mature.  For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

18

**B.**    **Short Option Positions**

37.    There are two types of options, calls and puts. A call gives the holder of the silver option the right, but not the obligation, to buy the underlying silver futures contract at a certain price, the strike price, up until some point in the future - options expiry.  Conversely, the put gives the holder the right, but not the obligation, to sell the underlying silver futures contract at the strike price up until options expiry.  Puts are usually bought when the expectation is for falling prices; a call is usually purchased when the expectation is for rising prices. The price at which an option is bought or sold is the premium.

38.    There are various ways to use options to "go short," i.e., bet that the price of silver will decrease.  One can sell a futures contract, which confer upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price.  One can also buy put options, which confers upon the buyer of the put option the right, but not the obligation, to sell silver to a buyer at a pre-specified strike price up until options expiry.   Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to buy silver from the seller at a pre-specified strike price up until options expiry.  The seller of the call option, in exchange for the option premium, commits to selling the futures contract at the strike price, at the buyer's election,

19

until options expiry.

    39.    In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall.  In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices.  In the case of a call option, the seller benefits if the prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

    40.    At expiry, if the price of silver exceeds a call option's strike price, the rational holder will exercise the call option, which means the seller of the call option, if unhedged, will have to sell the futures contract at the strike price and cover their position, paying the difference between the prevailing price and the strike price.  Conversely, if the price of silver falls short of the strike price, the call option expires out of the money and a rational holder of the call option will not exercise it. When options are out of the money, it means that there is no economic justification to exercise the option.  So, for example, there is no economic justification to exercise a call option with a $12 strike price if the underlying futures contract is trading at $11.  Conversely, if the underlying futures contract is trading at $12.50, there is a strong economic justification to exercise the call option

and purchase the futures contract at $12 and then sell it for a $0.50 gain.

41.    Likewise, at expiry, if the price of silver exceeds the strike price, the put option expires out of the money.  Conversely, if the price of silver falls below the strike price, the buyer will exercise the put option, which means the seller of the put option, if unhedged, will have to purchase a futures contract at the strike price and cover their position, paying the difference between the prevailing price and the strike price.

42.    In cases in which an entity creates a short position, the entity benefits as prices fall.  In the case of selling a futures contract, the seller at time of contract expiration simply offsets this position by purchasing a futures contract, pocketing the difference in prices.  In the case of a call option, the seller benefits if the prevailing price is below the strike price because the seller collects the option premium and pays nothing to the purchaser.  In the case of a put option, the seller benefits if the prevailing price is above the strike price because the seller collects the option premium and pays nothing to the purchaser.

43.    Silver options expire on a fixed day, usually four business days before the month prior to the delivery month of the underlying futures contract. Just prior to options expirations, it is not uncommon for there to be many outstanding out-of-the money options positions.  If the futures contract does not

fluctuate significantly, the seller of the out-of-the money option will net the option premium. However, if the price of the futures contract moves enough so that the option becomes in-the-money, the seller of the option will have to cover their unhedged options position. Such covering can exaggerate a futures price move because, when the unhedged futures position is covered, the purchase or sale of the futures contract occurs in the direction of the initial price move. So, for example, if a trader has sold out-of-the-money puts, and the price of the futures contract drops so that the put moves into the money, the trader will have to sell the futures contract in order to cover the unhedged option position. That is, being short in-the-money puts at expiration is equivalent to being long futures contracts. A trader in this position will sell the futures contracts to offset their long position from the puts. If a trader, or group of traders, are short a large enough number of the puts, the hedging (i.e., selling of futures) to cover their position will have the effect of driving the price of the futures contract still lower.

44.    The effect of price movements on options positions is accentuated by the use of the Black-Sholes type model to value options. The Black-Sholes options pricing model is a formula that creates a "delta", which estimates the equivalent futures position for an options portfolio. An option that is well in the money close to expiration will have a delta of approximately 1 for a call or

negative 1 for a put, meaning that owning the option is equivalent to being long 1 futures contract for the call or short 1 futures contract for the put.  Likewise, an option that is far out of the money close to expiration will have a delta of approximately 0, because it is unlikely that the option move to an in-the-money position.

45.    As an option nears a point of being in the money, the delta of the option approaches 0.5.  Many option traders use the measure of delta expressed in the Black-Sholes type models to hedge their delta exposure.  This means that if they hold many options, even if the delta is substantially less than one (and the option is out of the money), they may need to sell or buy futures to hedge their delta exposure.  So, for example, if a trader is short 100 out-of-the-money puts whose delta is 0.25, in order to be "delta neutral", the trader must sell 25 futures contracts.

46.    For the periods alleged below, JP Morgan purchased put options with strike prices that, prior to expiration, were far below the price of the underlying silver contracts.  These "far out the money options" were nearly always purchased from traders that used some variation of the Black-Sholes trading model.  JPM was fully aware that a trader using any Black-Sholes type trading model would hedge their short option positions based largely upon the option's

delta, i.e. the risk (represented on a scale of 0-1) that the option would be exercised. JPM also knew that options trading at prices far out of the money, particularly those that were set to expire shortly, would be assigned a delta near 0 and left largely unhedged by the traders who sold them. JPM was also aware that any sudden and unexpected decline in future prices would cause option deltas to skyrocket, perhaps to as high as 1, and send the sellers of far outside of the money puts scrambling to sell futures in order to hedge their newfound option risk. In such a selling frenzy, JPM would be able to purchase silver futures at prices far below what they had been trading only hours, if not minutes, earlier. In addition, the decline in future prices would allow JPM to profitably exercise options that shortly before seemed certain to expire worthless.

47.    As discussed more fully below, on several occasions, including on June 26, 2007 and August 15, 2008, JPM intentionally manipulated the price of silver futures contracts at or near the time of expiration for the express purpose of forcing the holders of short, out of the money options to cover their positions.

## C.    Physical and Futures Prices for the Underlying Physical Commodity are Directly Related to One Another

48.    The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date. Because the futures price is nothing more than an expectation of the future spot price, both

24

futures and physical prices must be and are, in fact, correlated. For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month. The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

49.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month. Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected. Thus, the increase today in futures price (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase. The same causal economic story (albeit in reverse) prevails if futures prices decline.

50.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today. Put statistically, futures prices and physical spot prices are linked and correlated.

II.   **Through Their Enormously Concentrated Short Positions, JP Morgan Had the Power to and Did Suppress COMEX Silver Futures and Option Contract Prices**

A.   **The COMEX Silver Futures and Options Contracts Market is Susceptible to Manipulation**

51.   The silver futures market is a thin market.  The number of futures contracts traded in the silver market is small, *i.e.*, thin, in comparison to markets involving other commodities.  For instance, in August 2008, there were only 129,240 open interest silver futures contracts, *i.e.*, silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

52.   The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as JP Morgan, to manipulate the price of silver futures contracts during the Class Period by flooding the market with orders for a disproportionate number of contracts.

53.   In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of participants controlling a large number of futures and options contracts.

54.     Prices in the silver futures and options market respond much more to large orders, large trades, and large positions than do prices in other commodity markets.

**B.     Substantive Allegations**

      **1.     JP Morgan's Manipulation On June 26, 2007, The Day of July Futures Options Expiration**

55.     Options on the July 2007 silver futures contract expired on June 26, 2007.  According to one witness, prior to this options expiry, JP Morgan purchased sizeable of out of the money puts in July 2007 futures between the strike prices of $12.75 and $12.00.  JP Morgan knew that if silver future prices traded below these strike prices, they could reap a profit by exercising the options, *i.e.*, selling the futures contract at the higher strike prices.  For example, if the market traded down to $12.25, JPM could exercise their put options to sell futures contracts at $12.75 and then immediately replace those futures contracts from the market at $12.25, a profit of $25,000 for each 10 put option contract that it held.

56.     Although there was no market-based reason for a negative price movement on this options expiration day, JP Morgan intentionally drove the price of July 2007 silver futures lower through large volume trades and "spoof orders." Spoof orders are high volume orders in the market that are not designed to be executed but, because traders can see that the orders exist, the orders provide a

strong, deceptive signal that the market is headed in a certain direction.  JPM

placed these large volume (spoof) sell orders for silver futures just above the price

at which the market was trading.  Those orders served as a ceiling or weight on the

market that deceptively encouraged other traders to sell futures in the belief that

the market was going to trade lower, because large sell orders implied some

fundamental weakness in the market price.

      57.    JP Morgan depressed the price of silver futures through volume trades

and spoof orders on June 26, 2007, for the purpose of forcing traders who were

short out-of-the-money puts to be forced to cover their positions as they attempted

to remain "delta neutral".  Traders who were short put positions that came into or

near the money as a result of the manipulation were forced to sell July 2007

futures, further reducing prices.  When the prices were near the $12.15 low, JP

Morgan purchased the futures contracts from the traders who were forced to cover

their short put positions.  JP Morgan also exercised its put options.  In this way, JP

Morgan profited on the manipulation.

      58.    JP Morgan executed its trades on this day through, at least, a futures

floor broker named Marcus Elias.  Marcus Elias was a former classmate and

wrestling teammate of Chris Jordan, a senior silver trader at JP Morgan.  After the

close of floor trading on June 26, 2007, Marcus Elias acknowledged that he had

executed purchase trades for JP Morgan at or near the lows of the market. Marcus Elias also executed sell orders on behalf of JP Morgan in the morning, which contributed to the price declines, and then purchased futures on behalf of JP Morgan subsequently as the market bottomed.

59.     Simply viewing the price movement of July futures that occurred on June 26, 2007 provides concrete evidence of the manipulation. On June 25, 2007, the day before expiration of the options on the July 2007 silver futures contract, the July 2007 silver futures contract settled at $12.877.

60.     On expiration day, however, the market traded from that settlement price, $12.877, all the way down to a low of $12.15 in the afternoon. The high trade on the day was $12.74. The silver futures market traded lower on June 26, 2007, despite the fact that other, related markets, such as gold, remained relatively stable, decreasing only by about 1.4%. The silver price decrease, in contrast, was very large in relation to typical silver futures price movements, at 4.6%. Historically, silver future movements are often correlated with gold price movements. There was no new information that came to market that day that would have provided the catalyst for such a strong downward move in price.

61.     After the floor session closed on the 26th at 1:25 pm, the July 2007 silver futures ceased to descend and trading stabilized. The graph below shows the

price movements that occurred for the June 26, 2007 electronic trading day, which

as a technical matter begins 45-minutes after the previous day's trading – June 25,

2007 at 6:00pm.



62.    The fact that, after options expiration and the close of floor trading,

the price of July silver futures stabilized is strong evidence that a manipulation

occurred during the period between six in the morning and four in the afternoon –

the period during which the market experienced a volatile downward push.

Indeed, on the 27th July futures partially retraced the previous day's precipitous

descent, reaching a high of $12.35.

63.     The volume of trading during the day also demonstrates how the downward pressure of the market corresponded to a significant increase in volume. On the electronic trading platform, the greatest volumes of trade occurred between seven in the morning and noon, the period during which prices made their largest move downward.  This increased volume was caused by the manipulative actions of JP Morgan.



64.     Additionally, the anomalous market behavior is demonstrated by the heightened volume of trading that occurred on June 26, 2007 compared with the surrounding days.  The trade volume for July silver futures on June 26, 2007 was essentially more than twice as large as the volume of trading during the five

trading days leading up to options expiration and significantly greater than that for

the five trading days afterward, as demonstrated by the chart below.



65.     Through its trading conduct on this day, JP Morgan intended to force

traders who were short out of the money puts to cover their positions.  As options

on July futures approached expiration, JP Morgan had no fundamental reason to

believe there would be a price move downward.  Yet JP Morgan maintained its put

positions until the last available day to trade these options – an economically

unjustifiable action because at expiration the options would expire out of the

money and worthless.  However, by virtue of this large put options position, JP

Morgan knew that a large and less capitalized segment of the market was conversely short these options.  So, rather than simply liquidate its out of the money positions at a loss, JP Morgan sold futures into the market and placed "spoof" orders to generate widespread panic.  This selling forced panicked traders to systematically sell silver futures.  As discussed below, this conduct was repeated again in August 2008.

66.   JP Morgan's conduct caused prices in the market to be divorced from real fundamentals of supply and demand.  Price behavior in silver on June 26, 2007, which lost almost 5%, bore little or no connection to trading in other related markets, such as gold, or to the performance of other commodities, fixed income or equity markets on that day.  Ten-year treasuries increased by about 0.2% and the Dow Jones Industrial Average hardly changed.  Gold dropped by a little over a percent, and the CRB commodities index lost less than a percent.

67.   Through its manipulative trading strategy, whose sole intent was to capitalize on the vulnerability of market players who were delta hedging as July options expired, JP Morgan caused July silver futures prices to move to artificially low levels.  JP Morgan's conduct interfered demonstrably with the beneficial price discovery mechanism of the futures market.

2.    **JP Morgan's Dominant Short Position**

      a.    **JP Morgan's Gradual Takeover of Bear Stearns' Large Net Short Position in COMEX Silver**

68.    Between March and August 2008, events occurred that provided JP Morgan with a much larger financial incentive to suppress COMEX silver futures prices than any incentive that JP Morgan had possessed on June 26, 2007 when it had engaged in the unlawful trading on that day, as alleged above.

69.    On March 17, 2008, (i) the COMEX silver futures contract price was $20.22 per ounce, and (ii) it became public knowledge that JP Morgan had agreed to acquire Bear Stearns.

(a) Bear Stearns had a short position in COMEX silver futures and options of approximately 130,000,000 ounces.

(b) JP Morgan's acquisition of Bear Stearns closed in May 2008. By August 5, 2008, JP Morgan's silver traders assumed full control of what had been Bear Stearns COMEX silver positions.

      b.    **Specifics of JP Morgan's Dominance**

70.    The CFTC issues monthly Bank Participation Reports that list the positions held by U.S. commercial banks in COMEX silver futures contracts. Through November 2009, the CFTC Bank Participation Reports provided the

34

number of reporting U.S. commercial banks that held COMEX silver futures contracts. This number was always listed as two U.S. commercial banks for the period May 2008 through November 2009. Those two U.S. commercial banks were JP Morgan and HSBC.

71.    Starting in December 2009, the CFTC no longer provided the number of U.S. commercial banks that held COMEX silver positions **IF** that number was less than four. Between December 2009 and the end of the Class Period, the CFTC did not provide the number of U.S. commercial banks holding COMEX silver positions. Therefore, the number of U.S. commercial banks holding COMEX silver positions at the time of each CFTC Bank Participation Report during this period was less than four. The two reporting U.S. commercial banks during this period continued to be HSBC and Defendant JP Morgan.

72.    Between May and July 2008, the CFTC Bank Participation Reports for U.S. commercial banks with positions in COMEX silver reflect an increase in short COMEX silver futures contracts from 3,077 to 6,199 contracts. Again, each COMEX silver futures contracts represents 5,000 ounces of silver.

73.    As of August 5, 2008, the CFTC Bank Participation Report reflected a 27,606 contract increase (to 33,805 contracts) in the short position of the two U.S. commercial banks that held COMEX silver futures.

35

74.    Plaintiffs have good grounds to believe and do allege that the large

increase effective August 5, 2008 in the CFTC Bank Participation Reports reflect

the increase in JP Morgan's short position of approximately 27,000 contracts,

which were finally taken control of from Bear Stearns by JP Morgan.

75.    These 27,000 short COMEX silver contracts as well as most of the

6,199 contracts pre-dating such increase, were held by JP Morgan.

76.    The CFTC Bank Participation reports reflect that the U.S. commercial

banks held very small **long** positions in COMEX silver.  For example, for the

period March 4, 2008 through the end of the Class Period, those reports reflect that

U.S. commercial banks held COMEX silver long positions of between zero and

approximately 1,900 contracts.

77.    These COMEX silver long positions, to the extent held by JP Morgan,

were miniscule compared to JP Morgan's short positions in COMEX silver.

Therefore, Plaintiffs have good grounds to believe and do allege that between 92%

and 100% of JP Morgan's COMEX silver exposure as of the reporting dates of the

CFTC Bank Participation Reports was short.

78.    Further, according to the August 5, 2008 CFTC Bank Participation

Report, the two reporting U.S. commercial banks held **33,805** short COMEX silver

36

futures contracts and **zero long** COMEX silver futures contracts.  In other words, the reporting banks were net short 33,805 COMEX silver futures contracts.

79.     Plaintiffs have good grounds to believe and do allege that HSBC's short position was very small and that Defendant JP Morgan's net short position constituted more than 92% of this 33,805 net short COMEX silver position on August 5, 2008.  In other words, on August 5, 2008, Defendant JP Morgan was net short approximately 31,000 COMEX silver futures contracts.

a. According to the CFTC Commitment of Traders Report dated August 5, 2008, the four largest net short traders in the COMEX silver futures market held approximately 42% of the 133,255 contract open interest.  Thus, on August 5, 2008, the four largest net short traders were net short approximately 56,000 COMEX silver futures contracts (or approximately 42% of the open interest).

b. Based on the foregoing allegations concerning the CFTC Bank Participation Reports and CFTC Commitment of Traders Reports together, Plaintiffs have good grounds to allege that Defendant JP Morgan held a net short COMEX silver position of that accounted **for approximately 56% of the net short** concentration of the four largest short traders in the COMEX silver market on August 5, 2008.

c. This means that not only was Defendant JP Morgan the largest net short in the COMEX silver futures market. JP Morgan's net short position was also significantly larger than the net short positions of the next three largest net short traders in the entire COMEX silver market COMBINED.

d. Between August 5, 2008 and March 25, 2010 (when the CFTC held the public hearing regarding manipulation of the silver markets), the CFTC Bank Participation Reports reflect that the short COMEX silver futures positions of U.S. banks stayed at levels comparable to the extraordinary levels that existed on August 5, 2008. Specifically, during this time, the NET short COMEX silver position of U.S. banks ranged between approximately 23,000 contracts and 41,000 contracts.

80.    The simple explanation for the continued extraordinary large levels of the U.S. commercial bank short positions in COMEX silver from August 5, 2008 forward, is that JP Morgan continued to hold an extraordinary large COMEX silver short position.

81.    The Comptroller of the Currency ("OCC")—an independent bureau of the United States Department of the Treasury—releases quarterly reports on U.S. bank trading and derivatives activities.

82.    The OCC Reports are not directly related to Defendant JP Morgan's

holdings of silver futures contracts.  But silver futures market participants look to

the OCC reports as indicative of the participation by U.S. banks in silver futures.

Defendant JP Morgan was regarded by market participants as being very active in

silver futures contracts.

83.    Table 9 of the OCC's quarterly report lists the notional amounts of

derivative contracts for precious metals (excluding gold) for the five largest (in

terms of total derivatives exposure) U.S. commercial banks and trust companies.

84.    For each quarter for the period from the second quarter of 2008

through the fourth quarter of 2010, Defendant JP Morgan was, by far, the largest

holder of precious metals derivative contracts.  During this two and one-half year

period, Defendant JP Morgan held between 45%-99% of the precious metals

derivative contracts owned by the top five U.S. banks.

85.    Based on the data in Table 9 of the OCC quarterly reports in 2008-

2010, the only other U.S. bank listed in such reports that consistently held any

short COMEX silver position was likely HSBC.  But HSBC's short COMEX silver

position was very small compared to that of Defendant JP Morgan.  Accordingly,

based on the public information currently available to Plaintiffs, Plaintiffs have

good grounds to believe and do allege that Defendant JP Morgan (a) continued to

be net short COMEX silver futures contracts for the remainder of the Class Period

and (b) did in fact hold the vast majority of the extraordinary short COMEX silver

position reflected in the CFTC Bank Participation Reports from August 2008

through the end of the Class Period.

86.    Based on the foregoing analysis, Defendant JP Morgan frequently

held large COMEX silver short positions that were as large as the other three

largest COMEX traders combined.  From March 2008 until August 2008, JP

Morgan's short position increased FIVE fold.  From August 5, 2008 forward, JP

Morgan held approximately 20 - 30% of the total short open interest in **all**

COMEX contracts.  During this time, in important COMEX individual futures

contracts, JP Morgan at times held 32% – 40% or more of the entire short open

interest.

87.    In fact, JP Morgan's holding of such large short positions tended to

"underprice" other shorts out of the market.  By itself, such a concentrated short

position moved COMEX silver futures prices down.  During the regime of JP

Morgan's extraordinary large short positions, COMEX silver prices initially did

substantially decrease and were thereafter lower than they otherwise would have

been.  For example, COMEX silver futures prices did decrease, and did

substantially underperform gold from the March 17, 2008 announcement until the

CFTC public hearing on March 25, 2010 relating to manipulation of the silver market.  *See* Summary of Allegations *supra*.

### c.   JP Morgan's Communications with HSBC

88.     Between 1996 and 2000, Robert Gottlieb, Christopher Jordan and Michael Connolly worked together at the Precious Metals Trading Desk of HSBC and at Republic National Bank of New York, prior to its acquisition by HSBC.

89.     In 2006, Jordan began his employment at JPMorgan where, until 2010, he was one of JPMorgan's principal COMEX silver futures and options traders.

90.     After a brief stint at Bank of America as a commodities trader, Mike Connolly returned to HSBC in 2007, where he served as Senior Vice President of HSBC's Precious Metals Desk.

91.     In March 2008, Robert Gottlieb began his employment at JPMorgan Chase where he presently serves as a Managing Director/Trader.

92.     Prior to JPMorgan's acquisition of Bear Stearns in 2008, Mr. Gottlieb had worked for Bear Stearns from January 2006 forward.

93.     Bear Stearns, through Robert Gottlieb and others, had developed the previously alleged large Bear Stearns short position in COMEX silver futures prior to March 17, 2008.

94.     Contrary to standard antitrust compliance manuals, Mr. Gottlieb regularly spoke to, and communicated and met with HSBC silver trader Mike Connolly from the time that Mr. Gottlieb joined JP Morgan until at least October 2010.

### d.     JP Morgan's Motive And Financial Incentive To Cause Lower COMEX Silver Futures Prices From The Second Quarter Of 2008 Forward

95.     By the second quarter of 2008 and continuing thereafter through the end of the Class Period, JP Morgan possessed a large financial incentive to cause lower COMEX silver futures prices. Lower COMEX silver prices caused the mark to market value of JP Morgan's short COMEX silver position to increase. The amount of the increase in the value of JP Morgan's short COMEX silver position was at least $100,000,000 and was as much as in excess of $150,000,000 for each $1 decline in COMEX silver prices. See also Section "2(d)" above regarding JP Morgan's financial motives.

### 3.     During The Regime of JP Morgan's Dominant Short Position, The Silver Futures Market Was Plagued By A Pattern of Uneconomic Conduct That Is Inconsistent With Trying To Get The Best Execution

96.     Consistent with JP Morgan's financial motive to have lower COMEX silver prices, the COMEX silver futures market began to experience relatively

frequent episodes of large uneconomic trades that depressed silver prices from the second quarter of 2008 forward. *See* Section "5" *infra*.

97.    COMEX silver was at $17.79 per ounce on July 31. COMEX silver then fell to $12.815 in 11 trading days. This constitutes a decline of 27.96%. Gold fell 14.1% or approximately one-half of this amount over the same period. For the first five of this 11 day period, silver declined a little over $1.00 per ounce.

98.    During this decrease, COMEX silver experienced a series of large sales during compressed time periods that are inconsistent with selling for the best price.

99.    On August 7, 2008, two days after the August 5th reporting date by which JP Morgan had assumed total control of the 27,000 contracts COMEX silver short position from Bear Stearns, silver prices moved down from $16.64 at 5:00 a.m. to $16.58 at 9:40 a.m.

100.    At 10:02 a.m., a total of 605 contracts traded within a single second. Within this second, silver moved down from $16.45 to $16.27 before recovering to close the second at 16.385.

101.    During this second, each trade was made, almost without exception, at a lower price. This indicates that a selling pressure of 600 contracts or $50,000,000 of Silver existed prior to that second.

102.   During the prior 15 minutes (900 times as long as the one second period), 943 contracts had been traded.

103.   The volume for each minute prior to the minute in which the trade occurred, varied between 9 contracts and 126 contracts.

104.   But the volume for this one minute was 1,030 contracts.

105.   At 1:40:53 on August 7, 2008, COMEX silver experienced selling that lasted two seconds; it was comprised of 460 contracts and took Silver from $16.22 to $16.06.  Prior to 1:41, the volume per minute varied from 3 contracts to 51 contracts from 1:29 – 1:40.

106.   But at 1:41 p.m. on August 7, the volume was 317 contracts.

107.   On August 11 at 2:25:25 a.m., a total of 185 contracts traded within a single second.  Silver fell from $15.32 to $15.12.

108.   Almost without exception, each trade during this one second period occurred at lower prices.

109.   Additional instances of large sales which depressed COMEX silver futures prices are alleged in Section "4"-"6" below.

**4.     Manipulation of Futures On August 14, 2008, Near September Futures Options Expiration**

110.   On August 14, 2008 (including electronic trading after 6:00 p.m. on August 14, 2008), as with the expiration of options on July 2007 silver futures

44

contracts (see Section "1" *supra*), JP Morgan manipulated the price of September 2008 silver futures contracts near the expiration of these options contracts.

111.   On August 15, 2008, from the previous trading day's settlement price for September 2008 silver futures of $14.23, the price of this futures contract traded down to a low of $12.72 and settled at $12.815.  In percentage terms, that was a decline of approximately 12% in one day, which is extremely large.  Also in percentage terms, from the high of the week to the low, the price of this silver futures contract was down an exceptional 17%.  From the previous day's high and the low on August 15, the drop was 13.9%, a substantial amount compared to Gold's 2.7% drop that same day.

112.   As with the manipulation in June 2007, the manipulation of COMEX silver futures prices prior to expiration of the options on September 2008 silver futures contract occurred absent any fundamental market-based explanation. According to one witness, the price movement occurred because JP Morgan used its massive selling power and spoof orders to move the market lower and to force the traders who were short those options to cover their positions.  Forcing a price decrease in this way had a magnifying effect when the short traders were forced to sell the futures in order to cover the puts they were short that had just come into the money.

113.   Trading volumes early on August 14, 2008 evidence the massive increase in trading, which along with the spoofing caused the extreme market movements.  For example, between 7:15pm and 7:30pm, there was an explosion in the number of September silver future contracts traded, from 27 total in the previous 15 minutes to 1,171 contracts.  That 4,237% trade increase started a downward price movement over the next hour, in which the price of CME silver futures contracts dropped from $14.11 to $12.80, a 10.23% drop.  The massive price drop forced delta-neutral traders to sell futures in large quantities to cover the puts they were short that had just come into the money.  The largest trade volume of the day occurred between 8:30pm and 8:45pm on August 14, 2008 and further drove prices down to below $12.50.  The graph below shows the relationship between price movement and trade volume.



114.   Additionally, as with the June 2007 manipulation, silver futures on the electronic trading platform experienced a significantly higher than normal volume of trading compared to the surrounding days.  The trade volume for September futures during August 15, 2008 trading period was 43% higher than the highest of the five days leading up to it, and 74% higher than the highest of the subsequent

five days, as reflected by the chart below.



115.   All of this occurred without any new information coming to the silver

market.  JP Morgan's conduct caused prices in the market to be divorced from the

real fundamentals of supply and demand.  Price behavior in silver on August 15,

2008, which lost over 9.9%, bore little or no connection to trading in other related

markets, such as gold, or to the performance of other commodities, fixed income or

equity markets on that day.  Ten-year treasuries decreased by about 1.3% and the

Dow Jones Industrial Average hardly changed.  Gold dropped by about 2.8%, and

the CRB commodities index lost about 2.7%.