UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
IN RE COMMODITY EXCHANGE, INC.,   :          11 Md. 2213 (RPP)
SILVER FUTURES AND                :
OPTIONS TRADING LITIGATION        :          **OPINION & ORDER**
                                                       :
-------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On September 12, 2011, Plaintiffs filed a consolidated class action complaint ("the

Complaint") claiming that Defendants J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp.,

J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc. (together, "JPMorgan" or the

"JPMorgan Group Defendants"), as well as twenty unnamed "John Doe" Defendants

(collectively, "Defendants"), violated Sections 9(a) and 22(a) of the Commodity Exchange Act,

7 U.S.C. §§ 13(a), 25(a), and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  (Compl. ¶¶

1-2, 22-29, 199-210, ECF No. 85.)  The Complaint alleges that Defendants violated these acts by

combining, conspiring, and agreeing to manipulate the prices of silver futures and silver options

contracts traded on the Commodity Exchange Inc. ("COMEX") on June 26, 2007 and also

between March 17, 2008 and October 27, 2010 (together, the "Class Period").  (Id. ¶ 1.)  The

Complaint further alleges that, as a result of Defendants' unlawful conduct, Plaintiffs, a

proposed class of individuals who transacted in COMEX silver futures and options contracts

during the Class Period, "lost money and were injured in their property."  (Id. ¶ 21.)

On December 12, 2011, the JPMorgan Group Defendants filed a motion to dismiss the

Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Defs. Mot. to

Dismiss, ECF No. 91.)  While argument was pending on the motion to dismiss, Plaintiffs filed a

motion to compel limited discovery on April 17, 2012.  (Pls. Mot. to Compel Ltd. Disc. ("Mot.

1

to Compel"), ECF No. 104.)  For the reasons stated below, the motion to dismiss is GRANTED and the motion to compel is DENIED.

## I.  FACTS ALLEGED IN THE COMPLAINT[1]

### A.  COMEX Silver Futures Contracts

A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future.  (Compl. ¶ 34.)  Market participants may trade silver futures contracts on COMEX, a centralized market division for the trade of various precious metals in the New York Mercantile Exchange ("NYMEX").  (Id. ¶¶ 31-32.)  For trading purposes, COMEX specifies the trading units, price quotations, trading hours, and trading months, as well as the minimum and maximum price fluctuations and margin requirements.  (Id.)  COMEX also provides standardized futures contracts with delivery dates that fall within the month that a futures contract is executed; the two calendar months thereafter; any January, March, May, or September occurring within twenty-three months of the execution month; or, any July or December occurring within sixty months of the execution month.  (Id. ¶ 33.)  Typically, "[t]he

---

[1]On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court's consideration "is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken."  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993).  The Court therefore presumes the truth of the factual allegations set forth in the Complaint, wherein Plaintiffs state that they "complain, on knowledge as to their own conduct, of Defendants."  (Compl. at 1.)  In a footnote, Plaintiffs further explain:

> Plaintiffs' information supporting their allegations made on information and belief include: (a) reports of statements by [CFTC] Commissioner Bart Chilton that the silver market has been and is being manipulated; (b) public news reports about the investigation by the CFTC of manipulation in the silver market; (c) news reports of JPMorgan's recent decision to close trading operations; (d) reports showing the recent reduction in the concentration of open interest in the silver futures contracts held by commercial firms; (e) reports of silver and gold prices and silver futures and silver options prices; (f) reports of trading activity, open interest and other aspects of silver futures, and silver options trading; (g) webcasts and statements of the March 25, 2010 Meeting of the CFTC to Examine Futures and Options Trading in the Metal Markets; (h) the following public reports: CFTC Commitment of Traders Reports; CFTC Bank Participation Reports; Bank for International Settlements OTC Derivatives Market Reports; Comptroller of the Currency Quarterly Reports On Bank Trading and Derivatives Actions; and the CFTC May 13, 2008 "Report on Large Short Trader Activity in the Silver Futures Market," and (i) other investigation including that reflected in specific allegations.

(Id. at 1 n.1.)

'soonest' two expirations are referred to as the 'front' months, and [these months] are the most actively traded."  (Id.)

At any given time, participants in the silver futures market are generally split evenly between "long position holders" (buyers who must <u>take</u> delivery of physical silver at contract expiration) and "short position holders" (sellers who must <u>make</u> the delivery at contract expiration).  (<u>Id.</u>  ¶¶ 30, 35.)  Only a small percentage of silver futures contracts, however, result in "delivery" (the consummation of the contract by physical exchange between a buyer and a seller).  (<u>Id.</u> ¶¶ 30, 36.)  Rather, traders generally "offset" their futures positions before a futures contract matures by purchasing or selling an equal number of futures contracts prior to maturation.  (<u>Id.</u> ¶ 36.)  A trader's realized profit or loss is quantified as the difference between the initial purchase or sale price and the price of the offsetting transaction.  (<u>Id.</u>)

### B.      Silver Futures Options Contracts

Silver traders may also offset futures positions by purchasing a silver futures options contract, which gives a purchaser the right, but not the obligation, to buy or sell a security at a specified price (the "strike price") on or before a specified date (the "options expiry").  (Compl. ¶¶ 37-42.)  Two types of COMEX silver options contracts exist: "calls" and "puts."  (<u>Id.</u> ¶ 37.) Call options are usually purchased when a buyer expects the prevailing price of silver to rise, while put options are usually purchased when a buyer expects the prevailing price to fall.  (<u>Id.</u>) In order to keep an option open, the buyer of an option contract may pay the seller of the option an "option premium."  (<u>Id.</u>)

At expiry, options will either be "out-of-the-money" or "in-the-money."  (<u>Id.</u> ¶¶ 37-43.) A call option will be out-of-the-money when the prevailing price of silver is less than the call option strike price.  (<u>Id.</u>)  In such a situation, the holder of the call option has no economic

incentive to buy silver futures contracts at a strike price higher than the prevailing market price, and the seller of the call option benefits by getting to keep the option premium.  (Id.)  The holder of a call option would, however, have an economic incentive to exercise his option to buy silver futures contracts if the prevailing price of silver exceeds the call option strike price.  (Id.)  In that situation, the call option would be in-the-money and the seller of the call option would be responsible for covering the difference between the strike price and the prevailing market price. (Id.)  The opposite conditions apply to put options.  An in-the-money put option occurs when the prevailing price of silver falls short the call option strike price.  (Id. ¶ 41.)  When this situation arises, the holder of the put option will likely exercise his right to sell the silver futures contract at a strike price that is higher than the prevailing market price.  (Id.)  Conversely, when the prevailing price of silver exceeds the call option strike price, the put option would be out-of-the-money.[2]  (Id.)

In order to value options, traders often use the Black-Sholes Pricing Model.  (Id. ¶ 44-45.)  This model is described as:

> [A] formula that creates a "delta," which estimates the equivalent futures position for an options portfolio.  An option that is well in the money close to expiration will have a delta of approximately 1 for a call or negative 1 for a put, meaning that owning the option is equivalent to being long 1 futures contract for the call or short 1 futures contract for the put.  Likewise, an option that is far out of the money close to expiration will have a delta of approximately 0,

---

[2]An example may help to elucidate this otherwise esoteric subject.  Let us posit that the price of silver currently stands at $100 per ounce.  Entity X, who expects prices of silver to fall, purchases a put option from Entity Y for $5 (the "option premium"), allowing X to sell one ounce of silver to Y for $100 (the "strike price") on December 31, 2012 (the "options expiry").  If, on December 31, 2012, the price of silver has fallen to $50 per ounce, the put option is in-the-money, and X will exercise his put option to sell one ounce of silver to Y for $100.  This will result in a loss of $45 for Y, who otherwise would have been able to buy the ounce of silver for $50 on the market (remember Y received the $5 option premium).  However, if on December 31, 2012, the price of silver has risen to $150 per ounce, the put option is out-of-the-money, and X will not exercise it; instead, he will sell the ounce of silver on the market for $150.  This will result in a $5 profit for Y, due to the option premium.  (See, e.g., Compl. ¶ 43.)

> because it is unlikely that the option [will] move to an in-the-money position.
>
> As an option nears a point of being in the money, the delta of the option approaches 0.5.  Many option traders use the measure of delta expressed in the Black-Sholes type models to hedge their delta exposure.  This means that if they hold many options, even if the delta is substantially less than one (and the option is out of the money), they may need to sell or buy futures to hedge their delta exposure.  So, for example, if a trader is short 100 out-of-the-money puts whose delta is 0.25, in order to be "delta neutral," the trader must sell 25 futures contracts.

(Id.)

### C.   The Commodity Futures Trading Commission

In 1974, Congress established the Commodity Futures Trading Commission (the "CFTC") as an independent government agency to regulate commodity futures and option markets in the United States.  See 7 U.S.C. § 1 et seq.  The CFTC is charged with protecting market users and the public from fraud, manipulation, and abusive practices in the commodity futures marketplace.  Id.  Should the CFTC suspect an attempted or perfected manipulation of the silver futures market, the CFTC has broad authority to investigate and, if appropriate, to pursue enforcement actions.  Id. §§ 7, 13(a)(2).

In 2004, the CFTC began receiving complaints that large commercial traders were manipulating the silver futures market.  (See Defs. Mem. in Supp. of Mot. to Dismiss ("Defs. Mem.") at 2-4, ECF No. 92.)  The CFTC summarized the general nature of these allegations as follows:

> With silver consumption exceeding new production for many years, it is generally acknowledged that the production deficit has been primarily filled by a drawdown of stocks. Some argue that this decline in silver stocks cannot persist and, since stocks have fallen to low levels, silver prices should have been rising sharply. There is further conjecture that, over the past 20 years, a group of

> commercial traders . . . have held short futures positions that are so
> large that they cannot serve legitimate hedging purposes because
> they cannot be backed by real silver. These traders have allegedly
> used these "naked" short positions to downwardly manipulate the
> price of silver. Moreover, the argument goes, this alleged
> 20-year-long manipulation of the silver market has created the
> conditions ripe for a huge price spike because stocks have reached
> dangerously low levels.

(Decl. of Amanda F. Davidoff in Supp. of Defs.' Mot. to Dismiss ("Davidoff Decl."), Ex. A

("May 14, 2004 CFTC Letter to Silver Investors") at 1-2, Dec. 12, 2011, ECF No. 90.)

In response to these complaints, the CFTC launched an investigation.  The results of the

investigation led the CFTC to conclude that the allegations of manipulation were unsupported

and "lack[ing] a coherent explanation of how such a manipulation could [have] occur[ed], or a

plausible explanation for a motive."  (Id. at 5.)  This conclusion notwithstanding, between 2005

and 2007, the CFTC received numerous new complaints that the silver futures market was being

manipulated downward.  (See Davidoff Decl., Ex. B ("May 13, 2008 CFTC Report on Large

Short Trader Activity in the Silver Futures Market") at 1.)  The CFTC investigated, but in a May

2008 report announced that it had again found "no evidence of manipulation in the silver futures

market."  (Id.)

The CFTC launched a third investigation into claims that the silver futures market was

being manipulated in late 2008.  (Compl. ¶ 7.)  On March 25, 2010, the CFTC held a public

meeting to "examine futures and options trading in the metals markets."  (Id. ¶¶ 175.)  It was not

until October 26, 2010, however, that CFTC Commissioner Bart Chilton publically announced

the existence of the investigation which had begun in late 2008.  (Id. ¶ 7(c).)  In so doing, the

Commissioner commented that he believed there had been repeated, fraudulent efforts "to

persuade and deviously control" prices in the silver markets.  (Id.)  The day after the

Commissioner's announcement, the first of the complaints later consolidated in this class action was filed.[3]  Since launching the investigation in 2008, the CFTC has engaged in discovery, but it is noted that the CFTC has yet to file a complaint against any party in the market manipulation that the Commissioner announced to be going on.  (<u>See</u> Status Conference Hr'g Tr. ("2/25/11 Tr.") 52-53, Feb. 25, 2011; <u>see also</u> Defs. Mem. at 4.)

## II.     CONSOLIDATED CLASS ACTION COMPLAINT

On September 12, 2011, Plaintiffs filed this consolidated class action Complaint alleging that (1) Defendants[4] manipulated the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a), 25(a), (Compl. ¶¶ 199-202); (2) "JPMorgan knowingly aided, abetted, counseled, induced, and/or procured" the alleged violations of the Commodity Exchange Act in violation of Section 22(a)(1), 7 U.S.C. § 25(a)(1), (Compl. ¶¶ 203-05); and (3) JPMorgan entered "an agreement, understanding or concerted action between and among JPMorgan and the John Doe Defendants," and "[i]n furtherance of this agreement, JPMorgan fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts" in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, (Compl. ¶¶ 206-10).  The Complaint further alleges that Defendants accomplished their manipulation of the COMEX silver market using diverse means, including: "(a) a dominant and manipulative short position and market

---

[3]<u>See, e.g.</u>, <u>Beatty v. JPMorgan Chase & Co., et al.</u>, No. 10 CIV 08146 (S.D.N.Y. Oct. 27, 2010); <u>Laskaris v. JPMorgan Chase & Co., et al.</u>, No. 10 CIV 08157 (S.D.N.Y. Oct. 27, 2010).  The Judicial Panel on Multidistrict Litigation consolidated all actions on Feb. 8, 2011.  (<u>See</u> Transfer Order, Feb. 8, 2011, ECF No. 1.)

[4]As stated <u>supra</u>, Defendants are the "JPMorgan Group Defendants" (J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., and J.P. Morgan Futures Inc.) and twenty unnamed "John Doe" Defendants.  (Compl. ¶¶ 22-29.)

power manipulation; (b) repeated manipulative and uneconomic trades and trade manipulation; (c) false trades made to facilitate a trade manipulation; and (d) other acts."  (Compl. ¶ 2.)

### A.    Market Power Manipulation

The Complaint first alleges that, between March 17, 2008 and August 2008, JPMorgan "gradually acquired control" from Bear Stearns of COMEX silver futures and options totaling approximately 130 million ounces.  (Compl. ¶¶ 3(a), 69.)  By this large acquisition, in combination with JPMorgan's previously held COMEX short positions, it is alleged that JPMorgan acquired substantial market power in COMEX silver futures contracts.  (Id. ¶¶ 3, 68-87.)  Indeed, Plaintiffs claim that, by August 5, 2008, JPMorgan held "significantly more net short COMEX silver positions than the next three largest traders on COMEX combined."  (Id. ¶¶ 3(b), 79, 86.)  Plaintiffs also assert that, based on their analysis of CFTC Bank Participation Reports and a CFTC "Commitment of Traders" Report, "from August 5, 2008 forward, JPMorgan held approximately 20-30% of the total short open interest in **all** COMEX contracts." (Id. ¶ 86 (emphasis in original).)  As JPMorgan acquired control of these large COMEX short positions, the Complaint alleges that the price of COMEX silver prices substantially decreased because "[b]y itself such a concentrated short position moved COMEX silver futures prices down."  (Id. ¶¶ 87, 3(c) (emphasis added).)  The Complaint further asserts that COMEX silver prices did not begin to rise until after the CFTC held its March 25, 2010 public hearing into the allegations that futures and options trading in the metals markets were being manipulated.  (Id. ¶ 3(d).)  After this date, the Complaint states, COMEX silver prices substantially outperformed COMEX gold prices.  (Id.)

**B.      Manipulative and Uneconomic Trades**

The Complaint next alleges that, during the Class Period, JPMorgan profited by using its dominant position in the silver futures market to make "large manipulative trades that repeatedly caused sudden, unreasonable and artificial fluctuations in COMEX silver prices." (Compl. ¶¶ 4(a), 46.) The Complaint describes these manipulative trading "episodes" as follows. (Id. ¶¶ 4, 55-58, 110-13.)

1. <u>Silver Futures Trading Activities of June 26, 2007</u>

The Complaint alleges that according to one unidentified witness, on June 26, 2007—the date when options on the July 2007 silver futures contract expired—JPMorgan "purchased sizeable out-of-the-money puts in July 2007 futures between the strike prices of $12.75 and $12.00." (Id. ¶ 55.) The Complaint posits that JPMorgan made these purchases because it "knew that if silver future prices traded below these strike prices, [it] could reap a profit by exercising [its] options, i.e., selling the futures contract[s] at the higher strike price." (Id.) The Complaint also asserts that "JPMorgan intentionally drove the price of July 2007 silver futures lower through large volume trades and 'spoof orders'" placed "just above the price at which the market was trading." (Id. ¶ 56.) The "spoof orders" were allegedly never meant to be executed, but instead were meant to "provide a strong, deceptive signal that the market [wa]s head[ing] in a certain direction." (Id.) According to Plaintiffs:

> JPMorgan placed these large volume (spoof) sell orders for silver futures just above the price at which the market was trading. Those orders served as a ceiling or weight on the market that deceptively encouraged other traders to sell futures in the belief that the market was going to trade lower, because large sell orders implied some fundamental weakness in the market price.

(Id.)

9

Then, when the prices decreased on June 26, 2007 to a low of $12.15 per ounce, the Complaint alleges, JPMorgan made a huge profit by exercising its put options and by purchasing futures contracts from traders who were forced to cover their own short put positions to remain "delta neutral."  (Id. ¶ 57.)  Because, after trading closed on June 26, 2007, the prices for July 2007 futures allegedly "ceased to descend and trading stabilized," (id. ¶ 61), the Complaint alleges that "[s]imply viewing the price movement of July futures . . . on June 26, 2007 provides concrete evidence" that JPMorgan caused the July silver prices to move to artificially low level levels, (id. ¶ 59).  The Complaint also alleges that, "[h]istorically, silver futures movements are often correlated with gold price movements[, but on June 26, 2007, t]here was no new information that came to market . . . that would have provided the catalyst for such a strong downward move in price."  (Id. ¶ 60.)

In addition, Plaintiffs assert that JPMorgan executed its trades on June 26, 2007 through, among others, a futures floor broker named Marcus Elias, who was "a former classmate and wrestling teammate of Chris Jordan, a senior silver trader at JPMorgan."  (Id. ¶ 58.)  As alleged in the Complaint, Elias acknowledges that, on June 26, 2007, "he executed purchase trades for JPMorgan at or near the lows of the market" and also "executed sell orders on behalf of JPMorgan in the morning . . . and then purchased futures on behalf of JP Morgan subsequently as the market bottomed."  (Id.)

2.  Silver Futures Trading Activities on August 14-15, 2008

The Complaint next alleges that JPMorgan's 2008 acquisition of the 130 million ounces in silver futures and options previously held by Bear Stearns gave JPMorgan an even greater financial incentive to manipulate the prices of silver futures on August 14-15, 2008, which was

just before the expiration of the September 2008 silver futures contracts.  (<u>Id.</u> ¶¶ 68-69, 110-11.)

Specifically, the Complaint states:

> On August 15, 2008, from the previous trading day's settlement price for September 2008 silver futures of $14.23, the price of this futures contract traded down to a low of $12.72 and settled at $12.815.  In percentage terms, that was a decline of approximately 12% in one day, which is extremely large.

(<u>Id.</u> ¶ 112.)  According to an unidentified witness, this "price movement occurred because JPMorgan used its massive selling power and spoof orders to move the market lower and to force the traders who were short those options to cover their positions."  (<u>Id.</u>)  The Complaint also alleges that JPMorgan was involved in these trades because, "without any new information coming to the silver market,"  (<u>id.</u> ¶ 115), "[t]he trade volume for September futures during [the] August 15, 2008 trading period was 43% higher than the highest of the five days leading up to it, and 74% higher than the highest of the subsequent five days," (<u>id.</u> ¶ 114).  Finally, it is alleged that Chris Jordan (the same JPMorgan senior silver trader who formerly wrestled with Marcus Elias) was "selling back large amounts of September put options at an enormous profit."  (<u>Id.</u> ¶ 118.)

3. <u>Allegations of Additional Uneconomic Trades</u>

In addition to the manipulative trades made on June 26, 2007 and on August 14-15, 2008, the Complaint alleges that JPMorgan used its dominant COMEX short position to bring about trades that were "inconsistent with trying to obtain the best sales price execution, but consistent with trying to move prices down by aggressively selling in a compressed period to receive less on the sales transactions."  (<u>Id.</u> ¶ 121; <u>see also</u> <u>id.</u> ¶¶ 5-6, 96-109.)  In support of this allegation, the Complaint discusses instances of unexpected "heavy selling" which occurred between April 2009 and August 2010.  (<u>Id.</u> ¶¶ 121-23.)  These instances were allegedly brought to the attention

of the CFTC Commissioner by an unidentified "market professional . . . registered with the National Futures Association," who was "a long time participant in the COMEX silver futures markets."  (Id. ¶ 122.)  An unnamed "whistleblower"[5] also allegedly contacted the CFTC on February 3, 2010 to report that JPMorgan would be making an unidentified "signal . . . indicating its intent to depress COMEX silver futures and options contracts two days later."  (Id. ¶ 125.) On February 5, 2010, this whistleblower contacted the CFTC "to confirm that the silver manipulation was a great success and [had] played out EXACTLY as predicted."  (Id. ¶ 126.)

### C.     False Trades Made to Facilitate a Trade Manipulation

Finally, the Complaint alleges that JPMorgan conspired with others to manipulate a pricing platform operated by Saxo Bank, a Danish investment bank.  (Compl. ¶¶ 138-39.) According to the Complaint, the Saxo Bank pricing platform provides clients of Saxo Bank, along with those who have "special access" to the platform, aggregated information on the trading price of silver.  (Id. ¶¶ 8-10, 157-58, 161.)  The Complaint explains that Deutsche Bank and JPMorgan are two of the banks which provide pricing data to Saxo Bank and that, as of January 28, 2008, Saxo Bank and JPMorgan had entered into "a prime broker agreement" that gave the bank's clients "access to greater liquidity and increased accuracy of trading data for their currency pair operations."  (Id. ¶ 161.)  The Complaint also states that two individuals—Albert Maasland and Steven Bellamy— worked at Saxo Bank and had previously worked for JPMorgan.  (Id. ¶¶ 149, 152.)

The Complaint then alleges that, "[d]uring the Class Period, between 5:45 p.m. and 6 p.m. (traditionally a period of very low trading volume during the twenty-four hour silver trading

---

[5]It is unclear from the Complaint if the unnamed "market professional" registered with the National Futures Association is the unnamed "whistleblower."  (Compare Compl. ¶¶ 124-25 with id. ¶ 122.)

day), a false trade appeared more than twenty-five times on Saxo Bank's pricing platform." (<u>Id.</u> ¶¶ 10, 162.) The Complaint states that each allegedly false trade was always followed by a "highly unusual" and very brief "violent drop down in price that caused COMEX prices to be lower than they otherwise would have been." (<u>Id.</u> ¶¶ 10-12, 162-63.) These false trades are asserted to be a "signal" after which followed "a sharp decline of a comparable dimension in the prices of COMEX silver futures contracts." (<u>Id.</u> ¶ 163.) To illustrate this pattern of illegal activity, the Complaint includes a list of allegedly fake trades that occurred on April 1-2, 2008; April 3-4, 2008; June 18-19, 2008; June 25-15, 2008, May 17-18, 2009; June 9-10, 2009; January 11-12, 2010; March 8-9, 2010. (<u>Id.</u> ¶¶ 166-74.)

## III. PROCEDURAL HISTORY

### A. Motion to Dismiss

On December 12, 2011, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (<u>See</u> Defs. Mot. to Dismiss, ECF No. 91; Defs. Mem. in Supp. of Mot. to Dismiss ("Defs. Mem."), ECF No. 92.) On February 14, 2012, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss. (Pls. Mem. of Law in Opp'n to Mot. to Dismiss ("Pls. Mem."), ECF No. 97.) Defendants filed their memorandum in reply on March 27, 2012. (Defs. Reply Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Reply Mem."), ECF No. 102.)

### B. Motion to Compel Limited Discovery

On February 25, 2011, Plaintiffs served Defendants with a request for production of documents. (<u>See</u> Aff. of Ian T. Stoll in Supp. of Mot. to Compel ("Stoll Aff.") Ex. D, April 18, 2012, ECF No. 106.) JPMorgan timely objected, arguing that Plaintiffs' requests were premature, overly-broad, unduly burdensome, and protected by attorney-client privilege and by

13

the work product doctrine.  (<u>See</u> Stoll Aff. Ex. E.)  More than one year later, on April 18, 2012, Plaintiffs filed a motion to compel requesting (1) discovery of all documents produced by JPMorgan to the CFTC during the CFTC's investigation of silver futures contracts and (2) an order that the parties confer pursuant to Rule 26(f) so that Plaintiffs could request "the basic documents reflecting [JP]Morgan's COMEX silver futures transactions and related conduct to any extent such documents were not contained in [JP]Morgan's production to the CFTC."  (Pls. Mem. in Supp. of Mot. to Compel ("Pls. Compel Mem.") at 1-2, ECF No. 105.)  On May 9, 2012, Defendants filed a memorandum of law in opposition to the motion to compel, (Defs. Mem. in Opp'n to Mot. to Compel, ECF No. 110), and on May 18, 2012, Plaintiffs filed a memorandum in reply, (Pls. Reply Mem. in Supp. of Mot. to Compel, ECF No. 112).

### C.  Oral Argument

On May 16, 2012, the Court held oral argument on Defendants' motion to dismiss.  After the argument, Plaintiffs sent the Court a letter seeking "to supplement an answer to [the Court's] questioning during oral argument" and "to respond to certain statements by Defendants during the reply portion of their oral argument."  (Letter from Pls. to the Court, May 17, 2012).  In response, Defendants sent a letter characterizing Plaintiffs' May 17 Letter as "tantamount to an improper sur-reply."  (Letter from Defs. to the Court, May 21, 2012.)  On May 22, 2012, the Court received another letter from Plaintiffs responding "to two points in [Defendants'] May 18 letter," but neglecting to address Defendants' contention that Plaintiffs' May 17 letter constituted an improper sur-reply.  (Letter from Pls. to the Court, May 22, 2012.)  Defendants responded "briefly to two inaccuracies in Plaintiffs' second sur-reply" in a letter dated May 23, 2012.  (Letter from Defs. to the Court, May 23, 2012.)  The Court, in an Order dated May 23, 2012, then ruled:

14

> While Plaintiffs did seek leave at oral argument to respond to certain of the Court's questions by letter, (see Tr. of May 16, 2012 Oral Arg. at 79), the substance of Plaintiffs' May 17 letter does exceed the scope of that request. Still, in view of the fact that Defendants have had an adequate opportunity to respond to Plaintiffs' letters, the Court will accept and consider the correspondence of the parties that has been submitted to this point. No further correspondence will be accepted.

(Order, May 23, 2012, ECF No. 117.)

## IV.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). In considering whether a plaintiff has "nudged [his] claim across the line from conceivable to plausible," id., a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the complainant, Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008); see also supra n.1. "Nevertheless, the court need not accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness." In re Amaranth Natural Gas Commodities Litig. ("Amaranth I"), 587 F. Supp. 2d 513, 528 (S.D.N.Y. 2008) (internal quotation marks and alterations omitted); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that 'tenet' is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (internal quotation marks and citations omitted).

## V.   DISCUSSION

Defendants argue that Plaintiffs' Complaint should be dismissed because Plaintiffs fail to allege with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure that

15

JPMorgan violated the Commodity Exchange Act by manipulating, or by assisting anyone else to manipulate, prices in the COMEX silver futures market.  (See Defs. Mem. at 6-7.) Defendants contend that the Complaint contains nothing more than generalized allegations of market conditions and "simply describe[s] how the COMEX market could be manipulated by trading near options expiration, allege[s] that JPMorgan held a large market position, compare[s] the price of silver with other commodities, and describe[s] market fluctuations and 'signals' unconnected to JPMorgan."  (Defs. Mem. at 14 (internal citations omitted).)  Defendants also argue that Plaintiffs' conclusory allegation that JPMorgan conspired with unnamed others through unspecified means fails to allege a Sherman Antitrust Act conspiracy under the pleading standards set forth in Twombly and its progeny.[6]  (See id.)  In response, Plaintiffs contend that the pleading standard set forth in Rule 8(a), and not the standard in Rule 9(b), applies to their Commodity Exchange Act manipulation claims.  (Pls. Mem. at 10-15.)  Moreover, Plaintiffs argue that their Complaint satisfies both Rule 8(a)'s relaxed particularity pleading standard as well as Rule 9(b)'s more stringent requirements.  (Id.)  Finally, Plaintiffs assert that Defendants failed to meet their burden to show that the Sherman Antitrust Act claims were not adequately pled.  (Id. at 32-34.)

---

[6]Defendants also argue that Plaintiffs' claims dating back to June 26, 2007 should be dismissed as time-barred pursuant to the Commodity Exchange Act's two-year statute of limitations.  (See Defs. Mem. at 20-23 (discussing 7 U.S.C. § 25(c)).)  Defendants calculate that these claims are time-barred because Plaintiffs filed the first complaint in this consolidated action on October 27, 2010.  (See id.)  Plaintiffs dispute this calculation and assert that Defendants' fraudulent concealment of their allegedly unlawful activities should toll the applicable statute of limitations period.  (See Pls. Mem. at 28-30.)  The Court declines to reach this issue at this time.  Where, as here, it is unclear from the facts alleged in the Complaint that a plaintiff had, or should have had, "inquiry notice," a factual dispute is raised that cannot be resolved at the motion to dismiss stage.  See In re Natural Gas Commodity Litig., 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2004); In re Sumitomo Copper Litig. ("Sumitomo II"), 120 F. Supp. 2d 328, 346-47 (S.D.N.Y. 2000); see also Premium Plus Partners, L.P. v. Davis, 2005 WL 711591, at *11-13 (N.D. Ill. March 28, 2005).

A.      **Commodity Exchange Act Market Manipulation Claims**

1.  <u>Pleading Standard to Show Elements of Market Manipulation</u>

In cases involving alleged violations under the Commodity Exchange Act, "courts in this district have applied a 'case-specific approach' to determine the applicable pleading standard by examining whether the alleged manipulative scheme includes a fraud element."  <u>CFTC v. Amaranth Advisors, L.L.C.</u>, 554 F. Supp. 2d 523, 538 (S.D.N.Y. 2008);  <u>see also</u> <u>CFTC v. Parnon Energy, Inc.</u>, 2012 WL 1450443, at *9 (S.D.N.Y. April 26, 2012) (discussing "case-specific approach").

Rule 9(b) requires that, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); <u>see also</u> <u>In re Amaranth Natural Gas Commodities Litig. ("Amaranth I")</u>, 587 F. Supp. 2d 513, 528-29 (S.D.N.Y. 2008) ("To comply with the requirements of Rule 9(b), a plaintiff alleging manipulation must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.") (internal quotation marks omitted).  Defendants argue that Plaintiffs' Complaint sounds in fraud because of the allegations claiming that Defendants made "fake" trades and also provided "false signals" and "spoof orders" for the purpose of misleading the market.  (Defs. Mem. at 13.)

Plaintiffs dispute this characterization of their Complaint and argue that, where, as here, a commodities market manipulation claim is based on a particular trading strategy, the Rule 8(a) pleading standard requiring only "a short and plain statement" should apply.  (Pls. Mem. at 12 (quoting Fed. R. Civ. P. 8(a)(2))); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (While "[t]he plausibility standard is not akin to a probability requirement, . . . it asks for more than a sheer possibility that a defendant has acted unlawfully.") (internal quotation marks and citation

omitted).  Plaintiffs further contend that their allegations of "false trades" are not the primary or direct means by which they allege that Defendants manipulated prices in the silver futures market, but rather were signals that Defendants used in furtherance of their manipulative trading activitiy.  (Pls. Mem. at 12.)

Upon review of the allegations presented in the Complaint, the Court declines to make a determination at this time as to which pleading standard should apply to Plaintiffs' claims.  See In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 598 n.5 (S.D.N.Y. 2011) (dismissing complaint because claims were not sufficient under either the Rule 8(a) or Rule 9(b) pleading standard).  As the following analysis sets forth, even under Rule 8(a)'s more permissive standard, the Complaint fails to plead factual allegations sufficient to allow the Court to draw "the reasonable inference" that Defendants are liable for the misconduct alleged.  Cf. Iqbal, 556 U.S. at 678.  Rather, the Complaint merely pleads facts that could be "consistent with" Defendants' liability and "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. (citing Twombly, 550 U.S. at 557).

2.  Elements of Market Manipulation

The Commodity Exchange Act prohibits any person  from "manipulat[ing] or attempt[ing] to manipulate the price of any commodity."  7 U.S.C. § 13.  While the term "manipulate" is undefined in the Act, "the CFTC and the courts have developed a four-factor test to determine whether a defendant has manipulated prices."  See Platinum & Palladium, 828 F. Supp. 2d at 598 (internal alterations omitted).  A court thus considers whether (1) the defendant possessed the ability to influence market prices; (2) the defendant specifically intended to influence market prices; (3) the alleged artificial prices exist; and (4) the defendant

18

caused the artificial prices to exist.  See id.; see also In re Cox [1986-1987 Transfer Binder], No.

75–16, Comm. Fut. L. Rep. (CCH) ¶ 23,786, 1987 WL 106879, at *4 (CFTC July 15, 1987).

    3.  Analysis of Alleged Market Manipulation

*(a)  Ability to Influence Market Prices*

The Complaint alleges that JPMorgan "frequently held large COMEX silver short

positions that were as large as the other three largest COMEX traders combined."  (Compl.

¶ 86.)  The Complaint also states that, "from August 5, 2008 forward, JPMorgan held

approximately 20-30% of the total short open interest in **all** COMEX contracts" and "32-40% or

more of the entire short open interest."  (Id. ¶ 86; see also id. ¶¶ 74-79.)  In light of these factual

allegations, it is plausible that JPMorgan had the ability to influence prices in the silver futures

market.  Cf. Parnon Energy, 2012 WL 1450443, at *10 (discussing the various ways a market

participant may influence market prices).  Moreover, JPMorgan declines to challenge that it

possessed the ability to influence market prices.  (See Reply Mem. at 6 n.8.)  On this basis, the

Complaint states sufficient factual allegations to plead the first element of Plaintiffs' market

manipulation claim.

*(b)  Intent to Influence Market Prices  –*

To plead the specific intent element of a claim for manipulation under Rule 8(a), a

plaintiff must allege that a defendant "acted (or failed to act) with the purpose or conscious

object of causing or [a]ffecting a price or price trend in the market that did not reflect the

legitimate forces of supply and demand."  Parnon Energy, 2012 WL 1450443, at *14 (internal

quotation marks omitted).  Defendants contend that Plaintiffs fail to allege facts which give rise

to a "strong inference of scienter" and that Plaintiffs' allegations actually create a stronger

inference that JPMorgan was using its short interest in the silver market to hedge its long

19

position in physical silver bullion.  (Defs. Mem. at 16-19.)  Plaintiffs dispute these assertions, arguing that JPMorgan's large financial incentive to manipulate the market, combined with JPMorgan's "unusual behavior," "bragging" comments, and physical deliveries of silver, all are "cohered with and explained by an intent to manipulate."  (Pls. Mem. at 22-26.)

      Plaintiffs' claims concluding that JPMorgan, as a large holder of COMEX silver futures contracts, short puts, and options, possessed the intent to hedge its holdings and manipulate market prices downward is not supported by sufficient factual allegations.  The Complaint relies on the percentage of short positions that Plaintiffs presume JPMorgan held during the Class Period and, given this large percentage, infers that Defendants must have had an intent to manipulate silver prices on the COMEX market.  (See Compl. ¶¶ 3, 69-79, 86, 95, 112-15, 130-37.)  The Complaint does not, however, include factual allegations showing that JPMorgan was anything more than "fully aware" that "any sudden and unexpected decline in future prices would cause option deltas to skyrocket . . . and send the sellers of far outside of the money puts scrambling to sell futures."  (Id. ¶ 46.)  Rather, the Complaint asserts that, "[i]n such a selling frenzy, JPMorgan would [have] be[en] able to purchase silver futures at prices far below what they had been trading only hours, if not minutes, earlier."  (Id.)  But this conclusory and speculative allegation, and the others like it, (see, e.g., id. ¶¶ 5, 43-45, 47, 51-54, 68-87, 96-109, 112-18, 137), are not supported by factual allegations showing that JPMorgan took specific actions which exhibited an actual intent to bring about, engage in, or did bring about the so-called "selling frenzy."  Cf. In re Rough Rice Commodity Litig., 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) ("Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the [Commodity Exchange Act].")

Indeed the Complaint is readily distinguishable from other cases where courts have applied the pleading standard under Rule 8(a) and found intent to manipulate to have been pled sufficiently.  In Parnon Energy, for example, the court inferred intent not only from the defendants' "trading activity following their awareness of the tight [crude oil] market," but also from the defendants' alleged conduct and contemporaneous communications discussing plans to execute a market manipulation strategy.  See 2012 WL 1450443, at *14-15.  Similarly, in Amaranth Advisors, the court drew the inference that defendants had acted with the intent to affect market prices because allegations in the complaint stated that the defendants exchanged "numerous instant message conversations" in which specific plans to drive up prices were discussed.  See 554 F. Supp. 2d at 532; see also CFTC v. Enron Corp., 2004 WL 594752, at *7 (S.D. Tex. March 10, 2004) (inferring intent where a complaint alleged that a defendant had conducted certain trades to "bid up" the market,  made it known to other traders that he was "bidding up" the market, and enlisted another trader's assistance as part of the scheme).

The Complaint here, by contrast, includes no reference to specific communications between the Defendants about any specific plan to cause artificial prices or an artificial price trend in the silver futures market.[7]  Moreover, although Plaintiffs do allege a relationship between floor trader Marcus Elias and his former wrestling teammate, JPMorgan senior silver trader Chris Jordan, these two men are not named as defendants and nothing in the Complaint alleges that either acted with the intent to manipulate market prices.  (Cf. Compl. ¶¶ 57-58, 118.) Elias's acknowledgment that, on June 26, 2007, he "executed purchase trades for JPMorgan at or near the lows of the market," and also "executed sell orders on behalf of JPMorgan in the

---

[7]Indeed Plaintiffs fail to articulate any basis for naming as defendants the subsidiary companies that comprise the JPMorgan Group Defendants in this class action.

morning . . . and then purchased futures on behalf of JP Morgan subsequently as the market bottomed," (id. ¶ 58), shows only that JPMorgan participated in trades on the COMEX silver futures market during that day.  Without additional factual support, Elias's statement does not give rise to the inference that he was acting with the intent of causing artificial price fluctuations within the market—let alone acting at the instigation of JPMorgan—as opposed to responding to market opportunities presented during the day.

Plaintiffs next contend that intent can be inferred from the Complaint's allegation that, "according to publicly available information, JPMorgan traders bragged . . . during the Class Period about their large trades which successfully moved silver prices."  (Id.¶ 176; see also Pls. Mem. at 24-25.)  But this generalized allegation does not state the date or the language of the remarks deemed to be "bragging;" identify the traders who are alleged to have made these remarks; discuss which of the many trades that took place over the more than two-and-a-half year Class Period were the subject of the traders' bragging; or indicate that the traders were acting at the instigation of JPMorgan to move silver prices on the market.  Thus, absent other supporting factual allegations or affidavits, these statements are not factually sufficient to "nudge" the Complaint "across the line" between the possibility that JPMorgan was acting with an intent to manipulate COMEX silver futures prices and the plausibility that it was doing so. Cf. Twombly, 550 U.S. at 570.

Finally, Plaintiffs argue that intent can be inferred from JPMorgan's "unusual" deliveries of silver between March 2008 and October 2010.  (Pls. Mem. at 24.)  In their opposition memorandum, Plaintiffs cite multiple paragraphs for their position to show that JPMorgan made such unusual deliveries, (see id. (citing Compl. ¶¶ 2-3, 5, 68-87, 130)), but only one of these sections—Paragraph 130—actually alleges that, over the two-and-a-half year period between

March 17, 2008 and October 27, 2010, JPMorgan "ma[d]e deliveries on silver futures contracts which did depress prices." (Compl. ¶ 130.) This allegation, without additional factual allegations as to the volume or timing of a delivery, cannot support Plaintiffs' claim that JPMorgan used deliveries to create an illegitimate supply factor. Indeed Plaintiffs themselves acknowledge that a "small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery." (Id. ¶ 36.) Moreover, as the CFTC explained in its 2004 Report, "commercial firms may legally hold futures positions for hedging or speculative purposes. The mere holding of speculative positions by either commercial or non-commercials is neither a violation of the CFTC or NYMEX rules, nor evidence of manipulation." (Davidoff Decl. Ex. A at 7.) Thus, Plaintiffs' general and conclusory allegation about JPMorgan's unusual deliveries is not factually sufficient to plead that Defendants acted with the purpose or conscious object of causing or affecting a price or price trend in the market. Cf. Harris, 572 F.3d at 72 ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that 'tenet' is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

For these reasons, Plaintiffs fail to meet Rule 8(a)'s requirement that a statement of facts do something more than "merely create[] a suspicion of a legally cognizable right of action." See Twombly, 550 U.S. at 555. The Complaint here does not include factual allegations sufficient to support the reasonable inference that Defendants acted with the purpose or conscious object of causing artificial to exist silver futures prices or an artificial price trend on the COMEX market.

23

*(c)  The Existence of Artificial Prices*

Artificial prices are those prices that do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets.  See In re Sumitomo Copper Litig., 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998); In re Cox, 1987 WL 106879, at *8-9.  When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue.  See Sumitomo Copper Litig., 182 F.R.D. at 90 n.6; (see also Pls. Mem. at 16 n.16).

Here, Plaintiffs claim "artificiality" on the basis that, on June 26, 2007, on August 14-15, 2008, and, between March 17, 2008 and March 25, 2010, COMEX silver futures prices "outperformed" or were "substantially" different from "the benchmark of gold prices that was used and approved by the CFTC" in its 2008 Report.  (Pls. Mem. at 16 (citing Compl. ¶¶ 9, 14-15, 87).)  But Plaintiffs raise these allegations without first explaining why COMEX silver futures prices should be compared solely to "the benchmark of gold prices."  Indeed, both the 2008 and 2004 CFTC Reports state that the CFTC "routinely" compares the price at which silver futures are traded on COMEX (as a division of NYMEX) with the prices at which silver futures are traded in the London Bullion Market (LBMA) and that it is the LBMA which provides "the benchmark value of silver in the marketplace."  (Compare Davidoff Decl. Ex. A at 5 with Davidoff Decl. Ex. B at 7-8.)  Furthermore, in the 2008 CFTC Report concluding that there had been no manipulation of the silver futures market between 2005 and 2007, the CFTC stated that "the basis difference" between NYMEX futures prices and LBMA futures prices for this period "ranged between plus and minus 5%, . . . although on a few occasions the basis was as much as 15%."  (Davidoff Decl. Ex. B at 8.)  During the Class Period at issue here, the average basis

difference between NYMEX and LBMA prices was also approximately 5%, (see Decl. of Amanda Davidoff in Supp. of Defs. Reply Mem. ("Davidoff Reply Decl.") Ex A ("Standardized LMBA-NYMEX Silver Basis Jan. 3, 2005 through October 27, 2010"), March 26, 2012, ECF No. 103), and this fact undercuts Plaintiffs' claim about artificial silver prices on COMEX during this period.[8]

Moreover, to the extent that the CFTC does compare the prices at which silver futures contracts trade with the prices at which other metals trade, the CFTC considers not only gold, but platinum and palladium as well.  (See Davidoff Decl. Ex. A at 4-5; Davidoff Decl. Ex. B. at 7, 12-13.)  In so doing, the 2008 CFTC Report upon which Plaintiffs base their COMEX gold price "benchmark" comparisons, observed that all four of these metals had similar price movements between 2005 and 2007.  (See Davidoff Decl. Ex. B at 7.)  The Report then concluded that there was "nothing obvious in the silver price series between 2005 and 2007, when compared to other metals' prices, to suggest that silver prices have been manipulated downward."  (Id.)  During the Class Period at issue here, these four metals have, in general, continued to exhibit similar price trends and, in particular, silver has continued to outperform platinum and palladium.  (See Davidoff Reply Decl. Ex. B.)  Accordingly, the Complaint's allegation that prices for silver—which, unlike gold, is an industrial metal—did not mirror the exact rate of price fluctuations for gold is not sufficient to support Plaintiffs' claim that artificially manipulated silver prices existed on COMEX during the Class Period.

---

[8]A court may take judicial notice on a motion to dismiss of items "that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); see also Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n. 8 (2d Cir.2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."); King Cnty., Wash. v. IKB Deutsche Industriebank AG, 708 F. Supp. 2d 334, 347 (S.D.N.Y. 2010).

Plaintiffs next argue that the existence of artificial prices was sufficiently pled because of the "snap back" in silver futures prices, which they allege occurred following—and because of—the CFTC's March 25, 2010 public hearing about prices in the metal markets.  (See Pls. Mem. at 17 (citing Compl. ¶¶ 3(d), 14, 79, 87, 130-33, 175-78).)  More specifically, Plaintiffs assert, without showing that JPMorgan had a dominant short position which had "a manipulative effect," that "from the time of" the March 2010 CFTC meeting, JPMorgan's dominant short position was reduced by one-third and this caused "a substantial <u>lessening</u> of JPMorgan's manipulative effect."  (<u>Id.</u>) (emphasis added).  Plaintiffs further assert that the "alleviation caused prices of the COMEX silver futures to snap back and go up in relation to the prices of the CFTC approved benchmark of COMEX gold prices."  (<u>Id.</u>)  Plaintiffs fail to address, however, the fact that during this same time period, the prices for silver and palladium moved in tandem with one another.  (<u>See</u> Davidoff Reply Decl. Ex. B.)  Plaintiffs also fail to make any showing as to how the alleged reduction of JPMorgan's dominant short position was tantamount to a "manipulative effect."

Although Plaintiffs rely on the securities fraud case, <u>ATSI Communications v. Shaar Fund, Ltd.</u>, 493 F.3d 87 (2d Cir. 2007), to support their argument, that case is distinguishable.  (<u>See</u> Pls. Mem. at 17 n.21 (citing <u>ATSI</u>, 493 F.3d at 103-04).)  Plaintiffs cite <u>ATSI</u> for "the premise . . . that an issuer's stock price, in the absence of manipulation, should increase when good news is announced."  <u>ATSI</u>, 493 F.3d at 103.  Notwithstanding the fact that the <u>ATSI</u> Court went on to critique this theory, stating that "[t]he strength of this broad proposition is questionable," <u>id.</u> n.5, the instant case is distinguishable from the situation in <u>ATSI</u>.  Here, Plaintiffs allege that "silver prices went down, while gold prices went up, during the regime of JPMorgan's dominant short position in silver.  But when JPMorgan's percentage concentration

in silver fell by one-third, silver prices then outgained gold prices." (Pls. Mem. at 17 n.21.) As just discussed, however, pegging silver prices to gold prices alone is an insufficient means of showing price artificiality. (See Davidoff Decl. Ex. A at 4-5, Ex. B at 7, 13-16.) Therefore, any difference between the prices of the two commodities is not readily analogous to the premise in ATSI as to how a market should react to "good news" absent manipulation and nowhere in the Complaint is there any allegation of similarly "good news."

Even more critically, Plaintiffs fail to show a correlation between the March 25, 2010 hearing and the rising price of silver futures on COMEX because prices did not actually increase until August 2010, more than five months after the CFTC hearing. (See Davidoff Decl. Ex. D.) Plaintiffs attempt to resuscitate their claim in their opposition memorandum by stating that, while the CFTC hearing was the cause of the "snap back," the impact of the meeting was only felt when, in August 2010, "it was publicly announced in news articles . . . that JP Morgan was exiting its proprietary commodities or metals trading operations." (Pls. Mem. at 17 n.20.) But this explanation still fails to connect the March 2010 CFTC meeting with the August 2010 market price fluctuations and therefore does not help to support Plaintiffs' cause and effect analysis.

Furthermore, the sample news report that Plaintiffs reference makes no mention of the March 2010 CFTC hearing, and instead discusses how JPMorgan "reportedly closed its proprietary trading desk for commodities, as an early reaction to the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act." (Davidoff Reply Decl. Ex. C (FO Week, "JP Morgan Closes Commodities Prop Desk," Aug. 27, 2010) at 2 (emphasis added).) In view of the many months separating the March 2010 CFTC hearing and the alleged August 2010 "snap back" in silver futures prices, as well as the fact that the news report upon which Plaintiffs rely

states that JPMorgan was reportedly acting in response to the Dodd-Frank Act and not to the

CFTC hearing, the alleged "snap back" is not sufficient to support Plaintiffs' claim about the

existence of artificial silver prices on COMEX during the Class Period.  Cf. In re DiPlacido

("DiPlacido II"), CFTC No. 01-23, 2008 WL 4831204, at *30-31 (CFTC Nov. 5, 2008) ("[A]

statistically unusual high (or low) price will not on that basis alone be deemed artificial.") aff'd

DiPlacido v. CFTC, 364 F. App'x 657, 661-62 (2d Cir. 2009).

       Plaintiffs' final argument that artificial prices existed during the Class Period relies on

allegations of "multiple, different illegitimate supply factors."  (Pls. Mem. at 17-18.)  According

to Plaintiffs, these factors "include (a) the large short position held by JPMorgan; (b) specified

uneconomic trades explicitly alleged to have been made by JPMorgan at specific times of day on

specific days on the COMEX; and (c) the classic manipulative device of deliveries by the

dominant short, JPMorgan."  (Id.)  These conclusory allegations, however, relate to Plaintiffs'

theories of causation, not to their claims of artificial prices.  Cf. Sumitomo Copper Litig., 182

F.R.D. at 90 n.6 (explaining that artificial prices may be shown through discussion of an

underlying commodity's normal market forces, historical prices, supply and demand factors,

price spreads, and also the cash market for the commodity at issue).

       More specifically, the first illegitimate supply factor that Plaintiffs cite—"the large short

position held by JPMorgan," (Pls. Mem. at 18)—is not, by itself, sufficient to support a claim of

artificial prices or potentially manipulative pressure because JPMorgan's short position on

COMEX was known and permitted by the CFTC, (see Compl. ¶¶ 71-87, 129-30).  Although

Plaintiffs rely on In re DiPlacido ("DiPlacido I"), CFTC No. 01-23, 2004 WL 2036910, at *3-7

(CFTC Sept. 14, 2004) to support their position, DiPlacido does not stand for the proposition that

a large short position necessarily causes artificial prices, (cf. Pls. Mem. at 18).  Rather, unlike the

28

situation here, artificial prices were found to exist in <u>DiPlacido</u> because the defendant, who had a

large long position in shell egg futures, created illegitimate supply factors by violating bids and

offers during the closing of options, making non-competitive after-hours trades, and paying more

or less money than was required to finalize trades.  <u>Id.</u> at *8-9; <u>see also</u> <u>DiPlacido II</u>,

2008 WL 4831204, at *10.

Plaintiffs' second argument about illegitimate supply factors is similarly weak.  (<u>See</u> Pls.

Mem. at 18.)  The allegation that large unspecified and "uneconomic" trades were taking place

on the COMEX during the more than two-and-a-half year Class Period is too general to plead the

existence of artificial prices.  Plaintiffs' final "illegitimate supply factor" allegation—that

Defendants used "the classic manipulative device of deliveries by the dominant short,

JPMorgan," (<u>id.</u>)—also does not show that JPMorgan created artificial prices.  As discussed

<u>supra</u>, the sections in the Complaint upon which Plaintiffs rely (<u>see</u> Pls. Mem. at 18 (citing

Compl. ¶¶ 2-12, 68-87, 96-120, 121-28, 130, 138-74)), to support their claim of an illegal supply

factor on the basis of "unusual deliveries" fail to identify the timing or volume of any delivery

by JPMorgan during the Class Period, and without these additional factual allegations, Plaintiffs'

illegal supply factor claim is insufficiently pled, (<u>see</u> Op. & Order, Section V.A.3(b)).[9]

For these reasons, Plaintiffs have failed to plead factual allegations sufficient to show

that artificial prices existed in the COMEX silver futures market during the Class Period.

Moreover, even if Plaintiffs had provided sufficient factual allegations in support of their

---

[9]To this point, the CFTC observed in its 2004 Report that, "[e]ven if the commercial short positions were not hedge positions, and even if their selling did cause the silver price to decline, any artificially low prices could not persist for long.  Because there is unrestricted access to the market, many knowledgeable and well-capitalized traders would readily buy any silver offered at artificially low prices.  The buying by these traders–buying that the alleged manipulators would have no way of preventing–would quickly cause the price to rise to its appropriate level." (Davidoff Decl. Ex. A at 5.)

artificial prices claim, Plaintiffs are still not be able to overcome their failure to plead causation, the fourth and final element in a market manipulation claim.

### (d)  Causation of Artificial Prices

The causation element requires that a defendant be the proximate cause of the price artificiality.  See In re Cox, 1987 WL 106879, at *12; see also DiPlacido v. CFTC, 364 F. App'x at 661-62.  Here, Plaintiffs argue two theories of causation: causation by JPMorgan's large short position and causation by JPMorgan's large uneconomic trades.  (Pls. Mem. at 18-21.) Defendants contend that these theories amount to "nothing more than generalized allegations of market conditions and trading patterns that are not linked to JPMorgan."  (Defs. Mem. at 14.) Defendants also point out that one of Plaintiffs' arguments is directly rebutted by the CFTC's 2004 and 2008 investigation reports, which found that "long-term downward manipulation of the silver market was 'not realistic' or 'plausible.'"  (Defs. Reply Mem. at 10 (citing Davidoff Decl. Exs. A & B).)

Under their first theory, Plaintiffs point to allegations in the Complaint of the approximate size of JPMorgan's short position at certain dates and the percentage that the position constituted in the silver futures market.  (See Pls. Mem. at 19-20 (citing Compl. ¶¶ 3-7, 51, 55-87, 110-20, 131, 133).)  Plaintiffs then ask this Court to infer that "[b]ecause JPMorgan held such a large dominant short position, it is difficult to imagine anyone else, working alone, who had the ability to cause such large declines in prices which, clearly, benefitted JPMorgan at least three times more than it benefitted any other trader."  (May 21, 2012 Letter from Pls. to the Court at 3 (emphasis added).)  However, the "imagination" required to link these conditions, without corroborating factual allegations as to trades, sworn affidavits, or other evidence is tantamount to impermissible speculation on the basis of sheer possibility.  Cf. Iqbal, 556 U.S. at

678 (While "[t]he plausibility standard is not akin to a probability requirement, . . . it asks for more than a sheer possibility that a defendant acted unlawfully.").

Plaintiffs' second theory that JPMorgan caused artificial prices by making large uneconomic trades on June 26, 2007, August 14-15, 2008, and at other times during the Class Period is no more successful. First, without more specific factual allegations as to the amounts and to the timing of certain trades, Plaintiffs' claim that JPMorgan submitted an unknown number of "sell orders" when silver prices were high and an unknown number of "purchase orders" when prices fell, (see, e.g., Compl. ¶¶ 55, 58), indicates no more than normal, rational market participation by JPMorgan. Indeed, the CFTC's 2005-2007 investigation considered the trades made on June 26, 2007 and determined that the market was free of manipulation at that time. (See Davidoff Decl., Ex. B at 1.) Secondly, the portions of the Complaint that discuss the August 14-15, 2008 silver price fluctuations rest on the conclusion that JPMorgan "must have" caused the fluctuations and high trading volume because no other "information coming to the silver market" explained the price behavior at that time. (Compl. ¶ 115.) The Complaint's descriptions of other uneconomic trades allegedly made during the Class Period similarly fail to allege specific conduct that might be reasonably attributed to JPMorgan.[10] (See Pls. Mem. at 21 (citing Compl. ¶¶ 2-7, 55-87, 95-127, 138-76).)

Moreover, the statements made by the unidentified "market professional," (Compl. ¶¶ 121-23), by the unnamed "whistleblower," (id. ¶¶ 125-26), and by the "bragging" JPMorgan traders, (id. ¶ 176), are not sufficiently factual to show that JPMorgan was the proximate cause

---

[10]At oral argument, Plaintiffs conceded this weakness when they stated, "[n]ow, in this case we allege 20-some odd examples, including J.P. Morgan, . . . but mostly not tied to J.P. Morgan, of situations where the day is really almost no trading going on and a big order comes in all at once and wants to come in all at once and moves the price down. (Tr. of May 16, 2012 Hr'g ("5/16/12 Tr.") at 80-81 (emphasis added).)

of the price fluctuations during the Class Period.  The unidentified market professional, for example, is alleged to have brought a series of trades to the attention of the CFTC, but the market professional is not alleged to have named JPMorgan as a party to these trades.  (See id. ¶ 122.)  Indeed every one of the market professional's statements are made in the passive voice alleging that, "there was heavy selling of silver and gold;""[t]here were large sellers who came into both the gold and silver markets to drive the prices down;" and so on.  (Id.)

By comparison, the unnamed whistleblower who contacted the CFTC in November 2009 does specifically name JPMorgan, but only to assert conclusory and speculative allegations that JPMorgan and its co-conspirators "manipulate[d] and suppress[ed] the price of COMEX silver futures and options contracts."  (Id. ¶ 123; see also id. ¶¶ 124-127.)  The Complaint alleges no other information about this whistleblower or about the details of the manipulation that the whistleblower is purported to have observed.  Indeed, the whistleblower's statement is itself speculative as to JPMorgan's role in the causation: "[h]ow would th[e price fluctuations] be possible if the silver market was not in the control of [JPMorgan and its co-conspirators] . . . . ?" (Id. ¶ 127 (alterations made in Complaint).)

For the reasons discussed supra, the statements by the "bragging" JPMorgan traders are also insufficient to support the allegation that JPMorgan caused artificial prices in the COMEX silver futures market.  (See Op. & Order Section V.A.3(b).)  The Complaint alleges no information about the date or the language of the remarks deemed to be "bragging;" the identity of the traders who made these remarks; which of the many trades that took place over the two-and-a-half year Class Period were the subject of the traders' bragging; and no information about whether the traders were acting at the instigation of JPMorgan to move silver prices on the market.  Cf. Harris, 572 F.3d at 72 (stating that "legal conclusions, and threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements" are not entitled to presumption of truth).

Finally, Plaintiffs' allegations are insufficient to support the claim that JPMorgan caused the Saxo Bank pricing platform to be manipulated.  (See Compl. ¶¶ 157-74.)  The Complaint fails to allege facts showing how JPMorgan traders accessed the proprietary Saxo Bank pricing platform or how JPMorgan might have issued the alleged spoof orders and fake signals on the platform.  In addition, Plaintiffs' descriptions of the alleged signal activity is purported to provide "details [of] the time, date, and price point of the false trade; the time, date, and volume of the dramatic decline in price on COMEX silver; and other details," but the Complaint fails to identify the parties involved in the illegal trading episodes on the pricing platform.  (Id. ¶ 166.) The Complaint's allegations also fail to demonstrate a cognizable relationship between the purported signals on the Saxo Bank pricing platform and the purported response in the COMEX market.  (See id. ¶¶ 167-74.)  Indeed, the fluctuations in the market prices, the bounce-backs, and the times at which the alleged trades occurred, differ widely among the examples that Plaintiffs cite.  (Id.)  Accordingly, neither of Plaintiffs' theories is sufficient to show plausibly that any actions by Defendants were the proximate cause of artificial prices on the COMEX during the Class Period as required under Rule 8(a).  Cf. In re Cox, 1987 WL 106879, at *12 ("If the multiple causes [of an artificial price] cannot be supported out, or if the respondents are not one of the proximate causes, then the charge of manipulation cannot be sustained.").

Thus, for the reasons just stated, the Complaint fails—under the standard set forth by Rule 8(a)— to plead factual allegations sufficient to allow the Court to draw "the reasonable inference" that Defendants are liable for the misconduct alleged.  See Iqbal, 556 U.S. at 678. Rather, the Complaint merely pleads facts that might be "consistent with" Defendants' liability

and it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. (citing Twombly, 550 U.S. at 557).  In light of the foregoing conclusion that Plaintiffs failed to meet the pleading standard of Rule 8(a), the Complaint therefore also fails to meet the heightened pleading standard set forth by Rule 9(b).

### B.       Commodity Exchange Act Aiding and Abetting Liability Claims

#### 1.   Elements of Aiding and Abetting Liability

Section 22 of the Commodity Exchange Act creates liability for any person "who willfully aids, abets, counsels, induces, or procures the commission of a violation" of the act. 7 U.S.C. § 25(a)(1).  In order to state a claim under this section, a plaintiff must show that a "defendant (1) had knowledge of the principal's intent to violate the Commodity Exchange Act; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  Platinum & Palladium, 828 F. Supp. 2d at 599;  see also Natural Gas Commodity Litig., 337 F. Supp. 2d at 511.

#### 2.   Analysis of Alleged Aiding and Abetting Liability

As a matter of law, where a complaint fails to allege the requisite intent of any primary actor to manipulate a market, that complaint also fails to state a claim for aiding and abetting liability in violation of Section 22 of the Commodity Exchange Act.  See Platinum & Palladium, 828 F. Supp. 2d at 599.  Here, Plaintiffs have failed to state a claim for market manipulation by a principal, (see supra, Section V(A)), and thus have also failed to state that Defendants are liable for knowingly aiding and abetting a market manipulation.  Plaintiffs' claims also fail to state a claim for aiding and abetting liability because the Complaint does not identify the persons alleged to have been involved in knowingly aiding and abetting the alleged manipulation of silver futures prices on the COMEX market.  Indeed the Complaint includes no reference to

34

specific communications between the Defendants or acts about plans to manipulate the market.

Plaintiffs' aiding and liability claim is therefore dismissed.

### C.      Claims under the Sherman Antitrust Claim

1. Elements of Sherman Antitrust Violation

Under Section 1 of the Sherman Antitrust Act, "[e]very contract, combination[,] . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1.  To state a claim under Section 1, a plaintiff must provide plausible grounds to show that the "challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  Twombly, 550 U.S. at 553 (internal quotation marks omitted); see also In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (dismissing conspiracy claims because plaintiffs were "unable to allege facts that would provide plausible grounds to infer an agreement") (internal quotation marks omitted).  "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." Twombly, 550 U.S. at 553 (internal quotation marks and alterations omitted).

2. Analysis of Alleged Sherman Antitrust Violation

Defendants argue that Plaintiffs' Sherman Antitrust claim should be dismissed because the Complaint rests almost entirely on the recitation of Section 1's legal elements and because such "'threadbare recitals of the elements of a cause of action' are not entitled to be taken as true."  (Defs. Mem. at 24 (citing Harris, 572 F.3d at 72).)  Defendants also argue that the Sherman Antitrust claim should be dismissed because the Complaint fails to plead sufficient factual allegations about either the identity of any alleged co-conspirator or the existence of any agreement—tacit or otherwise.  (Defs. Mem. at 23-25; Defs. Reply Mem. at 16-17.)  Plaintiffs

35

respond that "the Complaint contains specific allegations of concerted action by JPMorgan and an identified floor broker [Marcus Elias] and unidentified other floor brokers, in furtherance of their participation in a contract, combination or conspiracy to manipulate and suppress the prices of silver futures and options contracts traded on the COMEX."  (Pls. Mem. at 32-33 (citing Compl. ¶¶ 5, 27, 56-57, 110-128).)

The paragraphs, 5, 27, 56-57, and 110-128, which Plaintiffs cite in support of their conspiracy claim are conclusory statements, however, and, without more, show only that JPMorgan was engaged in some level of ordinary market activity.  Cf. Williams v. Citigroup, Inc., 2009 WL 3682536, at *6 (S.D.N.Y. Nov. 2, 2009) (dismissing Section 1 claim where complaint did not state factual allegations as required by Iqbal and Twombly identifying co-conspirators or showing that an agreement was made), aff'd in part and vacated in part on other grounds, 433 F. App'x 36 (2d Cir. 2011).  For example, referenced Paragraph 27 states that,

> John Doe Defendants 1-10 are persons, whose identities are presently unknown to Plaintiffs, who performed, participated in, furthered, and/or combined, conspired, or agreed with JPMorgan to perform the unlawful act[s] alleged herein, including acting as JPMorgan's broker in the restraint of trade, fixing of prices, and manipulation of silver futures and silver options traded on the COMEX.

(Compl. ¶ 27.)  This Paragraph does not contain sufficient factual allegations to support the existence of a conspiracy by JPMorgan to restrain trade or to manipulate the silver futures markets.  Nor do cited Paragraphs 110 through 120.  Contrary to Plaintiffs' assertion that these particular paragraphs "detail[] JPMorgan and its co-conspirators' manipulation of COMEX silver futures contracts on August 14, 2008," (Pls. Mem. at 33), these paragraphs describe silver futures market price fluctuations and then cite the statement of an unidentified witness to link the price movement to JPMorgan alone, (see id. ¶ 112) ("[T]he price movement occurred because

JPMorgan used its massive selling power and spoof orders to move the market lower . . . .")

(emphasis added).  But there is no allegation explaining how JPMorgan "used" its selling power

to move the market.  Referenced Paragraphs 121 and 122 similarly fail to identify any party that

might have been involved in a conspiracy to bring about the "high-volume, uneconomic and

irrational trading that caused artificial COMEX futures silver prices."  (See Pls. Mem. at 33

(summarizing allegations from Complaint).)  In this regard, the Complaint also fails to explain

the basis for its allegations that the subsidiary companies within the JPMorgan Group

Defendants were engaged in such a conspiracy.  (See Compl. ¶¶ 22-25.)

Although Paragraphs 57 and 58 do discuss how Marcus Elias, a former wrestling

teammate of JPMorgan senior silver trader Chris Jordan, acknowledged executing purchase

trades for JPMorgan on June 26, 2007, these paragraphs do not allege any type of conspiracy

between the two men and neither is named as a defendant or conspirator in this action.

Likewise, the paragraphs in the Complaint insinuating the existence of a specific relationship

between JPMorgan and HSBC, (see id. ¶¶ 88, 90, 94, 138-63, 181), do not allege any facts

showing that JPMorgan conspired with HSBC to violate the Sherman Antitrust Act, and HSBC

is not named as a defendant in this case, (id. ¶¶ 26).

The Complaint also lacks sufficient factual allegations to support Plaintiffs' claim that

the Saxo Bank trading platform served as a vehicle for Defendants' alleged conspiracy.  Indeed

the Complaint provides only the conclusory allegations that JPMorgan and unidentified co-

conspirators used Saxo Bank as a vehicle for making "signals" that were used to drive down the

price of silver futures contracts.  (See id. ¶¶ 150, 154, 153, 161.)  However, the Complaint  fails

to include any factual allegations as to the identity of these alleged co-conspirators, the existence

of the agreement between them, or the relationship that JPMorgan had to the purported

37

"signals." For these reasons, the Complaint fails to state sufficient factual allegations as required by <u>Twombly</u> to show the existence of an actual conspiracy to manipulate the price of COMEX silver futures and options. <u>Cf.</u> <u>Twombly</u>, 550 U.S. at 556-57. Plaintiffs' claim that Defendants violated Section 1 of the Sherman Antitrust Act is therefore dismissed.

## VI.      MOTION TO COMPEL LIMITED DISCOVERY

Plaintiffs' motion to compel requests (1) discovery of all documents produced by JPMorgan to the CFTC during the CFTC's investigation of silver futures contracts and (2) an order that the parties confer pursuant to Rule 26(f) so that Plaintiffs can request "the basic documents reflecting [JP]Morgan's COMEX silver futures transactions and related conduct to any extent such documents were not contained in Morgan's production to the CFTC." (Pls. Compel. Mem. at 1.) To support their discovery request, Plaintiffs rely on an unpublished order from <u>In re Platinum & Palladium Commodities Litigation</u>, denying a defendant's motion to stay the discovery of documents already produced by the defendant to the CFTC. (<u>See</u> Pls. Compel Mem. at 6-7 (discussing <u>Platinum & Palladium Commodities Litig.</u>, No. 10 CIV 3617, ECF No. 59 (S.D.N.Y. Nov. 30, 2010)).) This authority is not persuasive, however, because the situation in <u>Platinum & Palladium Commodities Litigation</u> is easily distinguished from the present matter.

In <u>Platinum & Palladium Commodities Litigation</u>, the plaintiffs initiated an action against the defendants <u>after</u> the CFTC had issued an order finding that the defendants had traded palladium and platinum futures contracts "with the intent to move higher the settlement prices." <u>Platinum & Palladium Commodities Litig.</u>, No. 10 CIV. 3617, ECF No. 59 at 2. The plaintiffs in that case also attached the CFTC's order to their complaint against defendants. In light of this CFTC order, the <u>Platinum & Palladium Commodities Litigation</u> Court concluded that limited discovery of the documents produced to the CFTC was "reasonable under the circumstances

38

while the motion to dismiss [wa]s pending." Id.  Here, by contrast, the Complaint does not

include any attached CFTC order stating that Defendants traded in silver futures contracts with

an intent to manipulate settlement or market prices.[11]  Moreover, the CFTC has twice initiated

investigations into the alleged manipulation of the COMEX silver futures market and twice

found that no such manipulation occurred.  (See Davidoff Decl., Exs. A & B.)  The CFTC's third

and still ongoing investigation has spanned  more than three years, and has also yet to result in

any charges being filed.  Because it is not clear that Plaintiffs' Complaint is viable or that the

CFTC's lengthy investigation into Defendants' conduct will result in any criminal action being

filed, Plaintiffs' motion to compel limited discovery is DENIED.

## VII.   LEAVE TO REPLEAD

Rule 15(a) of the Federal Rules of Civil Procedure provides that courts "should freely

give leave" to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Here,

however, Plaintiffs have represented that they "alleged all [they] realistically could," in their

lengthy 90-page, 210-paragraph consolidated class action Complaint filed on behalf of the forty-

four individual plaintiffs.  (See May 17, 2012 Letter from Pls. to the Court at 4.)  In light of

Plaintiffs' representation and the fact that the class action Complaint still fails to plead factual

allegations sufficient to support Plaintiffs' claims, and because the Court is unaware that

---

[11]In response to Plaintiffs' request for the production of documents at a status conference on February 25, 2011, the
Court similarly observed:

> I'm sure the discovery that was done for the commodities futures exchange was a pretty massive
> discovery, knowing what the government would request generally under the circumstances.  And it's
> been three years since they started that discovery.  And there's been no complaint.  So I'm a little
> reluctant to order the discovery, unless I see the ground that Judge Pauley acted on [in Platinum &
> Palladium Commodities Litigation].  Normally, in these cases, you don't get discovery until after an
> issue is joined . . . . So I want to see the grounds upon which he acted.  Maybe if you have a criminal
> charge, and you have an antitrust case arising out of the same facts and circumstances, that's one
> thing.  But if you don't have the charge, it's another.

(2/25/11 Tr. at 52-53.)

anything has developed since oral argument, it is not clear that justice so requires leave to amend the Complaint at issue. See Williams v. Citigroup, 659 F.3d 208, 212 (2d Cir. 2011) (recognizing wide discretion afforded to district courts to dismiss complaint without granting leave to replead). Plaintiffs will be given thirty days from the filing of this opinion to show good cause why leave to file an amended complaint is necessary.

## VIII.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (ECF No. 91) is GRANTED. Plaintiffs will be given thirty days to show why leave to replead is necessary. Plaintiffs' motion to compel limited discovery (ECF No. 104) is DENIED.

IT IS SO ORDERED.

Dated:  New York , New York
        December 21, 2012

Robert P. Patterson, Jr.
U.S.D.J.

40

**Copies of this Opinion & Order were sent via fax or email to:**

Plaintiffs' Interim Lead Class Counsel

Christopher Lovell
Lovell Steward Halebian Jacobson LLP
61 Broadway, Suite 501
New York, NY 10006
Ph: (212) 608-1900
Fax: (212) 719-4677

Counsel for Defendants JPMorgan Chase & Co.; JPMorgan Clearing Corp.; JPMorgan
Securities, Inc.; JPMorgan Futures, Inc.

Amanda Flug Davidoff
Sullivan & Cromwell LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
Ph: (212) 956-7500
Fax: (212) 293-6330
Email: davidoffa@sullcrom.com

Daryl A. Libow
Sullivan & Cromwell LLP
1701 Pennsylvania Ave., N.W.
Washington D.C. 20006
Ph: (202) 956-7500
Fax: (202) 293-7495
Email: libowd@sullcrom.com