UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE COMMODITY EXCHANGE, INC.
SILVER FUTURES AND
OPTIONS TRADING LITIGATION

1:11-md-02213-RPP

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE AMENDED
<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

I.  Plaintiffs Allege A Plausible CEA Claim ................................................................................1

   A.  Manipulative Intent. ........................................................................................................1

       1.  Long Term Uneconomic Conduct To Depress Prices. ..................................1

       2.  Motive and Opportunity ..................................................................................3

   B.  Causation of Lower Prices .............................................................................................5

   C.  Artificial Prices ...............................................................................................................8

II. Plaintiffs Plausibly Allege That Defendants Violated Section 2 Of The Sherman Act ........................................................................................................................9

III. JP Morgan Fails To Carry Its Non-Movant Burden By Failing To Identify Any Prejudice Resulting From Plaintiffs' Proposed Amendment .................................................10

CONCLUSION ........................................................................................................................10

i

Plaintiffs respectfully submit this Reply in order further to demonstrate that, under *Anderson News, LLC v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012) ("*Anderson News*"), *cert. denied sub nom. Curtis Circulation Co. v. Anderson News, LLC*, 133 S.Ct. 846 (2013),[1] Plaintiffs' allegations now plausibly allege that Defendants manipulated COMEX silver futures prices in violation of the CEA and antitrust laws. Point I and II *infra*. Also, Defendants fail to demonstrate cognizable prejudice under FRCP Rule 15(a). Point III *infra*.

**I. Plaintiffs Allege A Plausible CEA Claim.**

**A. Manipulative Intent.** Contrary to Defendants, manipulative intent may be inferred from circumstances. *In re Diplacido*, CFTC No. 01-23, 2008 WL 4831204 at *27 (C.F.T.C. Nov. 5, 2008) ("*DiPlacido*") (intent may be inferred from the totality of the circumstances) *aff'd DiPlacido v. CFTC*, 364 Fed.Appx. 657 (2d Cir. 2009). This includes knowing actions to inject "large" positions into a market in order to move prices. *Kohen v. Pacific Inv. Management Co. LLC*, 244 F.R.D. 469, 484 (N.D. Ill. 2007) ("[I]n a market that was susceptible to manipulation by a dominant long position, it is reasonable to infer that defendants were well aware of their potential ability to influence prices and that they intended to manipulate the futures market at the time of acquisition of the large contract positions.")

**1. Long Term Uneconomic Conduct To Depress Prices.** Further contrary to Defendants, Plaintiffs plausibly allege that JP Morgan knew of the following:

1. The CFTC's "Report on Large Short Trader Activity In the Silver Futures Market" dated May 13, 2008 indicated that a large concentration in the COMEX silver market would depress silver prices and that one large dominant short would cause such a large concentration that would depress silver prices. ¶¶129-136. But the CFTC found that there was a rotating, different market player who held the largest short position during 2005-2007 and, moreover, that there was not a significant concentration on the short side of COMEX silver during 2005-2007. ¶¶129-130.

---

[1] *Anderson News*, 680 F.3d at 185, *cert. denied sub nom. Curtis Circulation Co. v. Anderson News, LLC*, 133 S.Ct. 846 (2013) ("A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.").

2. If JP Morgan maintained a large dominant short position on the COMEX resulting in a larger publicly reported concentration of the COMEX short position, it would have a depressant effect on COMEX silver prices.  ¶¶137(e)-(i).
3. It would also have a depressant effect on London silver prices because COMEX was the "price leader" **virtually all of the time** and the London silver market prices followed the COMEX prices.  ¶¶137(a)-(d).
4. However, the London market was a professional market of bullion dealers and large hedgers who made large transactions with minimal effect on prices whereas the COMEX was a small illiquid market in which transactions of significant size had significant impact on prices.  ¶¶137(b)-(c).
5. Accordingly, the standard practice for a bullion dealer or large hedger was to make the large transactions in the London silver market.  ¶¶137(b).  Thereby, the bullion dealer or hedger economically was able to make higher priced sales because it had less downward effect on prices when it sold.  ¶137(f).  This created a larger spread and profit between the hedger's sale price on the London market and the price of whatever physical bullion or physical transaction it was offsetting.  ¶¶137(u).
6. If JP Morgan had been transacting as a bullion dealer or as a hedger that was not trying to move the prices, it would have followed the standard practice for such dealers and hedgers, and would have transacted on the London market.  ¶137(f).  It would have been content there with the higher profit and spread that it was receiving between its London sales prices and the prices of its related offsetting bullion transactions.  ¶¶137(f), (v).
7. Contrary to the standard economic conduct by a bullion dealer or large hedger to make large sale transactions at the higher prices available on large transactions in the London market, Defendants focused their concentrated short positions and made their large sale transactions on the COMEX silver market.  ¶¶137(a)-(d).
8. This had a depressant and suppressant impact on COMEX silver futures prices in, first, Defendants' own transactions.  ¶¶137(e)-(f).  It further caused the reported concentration on the short side of the COMEX market to be larger, which further depressed COMEX silver prices.  ¶¶137(f)-(g).  And it had the further price depressing effect resulting from COMEX acting as a price leader for London, and leading the London bullion price lower.  ¶¶137, 137(d), (g).
9. Thus, JP Morgan gave up the higher prices at which it could have sold in the London market in order to uneconomically sell at lower prices on COMEX and thereby cause lower COMEX and overall silver prices as a result.  ¶137(e)-(f).
10. By transacting in the COMEX market, contrary to standard practice, JP Morgan suffered worse, lower prices for its sales and less profits on its bullion futures spread (if any).  ¶¶137(a), 191.  But JP Morgan thereby had more of a downward effect on prices in the multiple ways described above.  ¶137(t).

With knowledge of all the foregoing, JP Morgan intentionally continued to focus its large dominant position on the small COMEX market throughout the Class Period.  ¶¶137(a).  JP Morgan thereby repeatedly and intentionally engaged in each of the foregoing steps to reduce COMEX silver prices.  ¶137(e).  Thus, JP Morgan engaged in long-term uneconomic conduct to

selling for less just as and even much more than the trader in *DiPlacido* intentionally purchased for higher price in short term conduct. *DiPlacido*, 2008 WL 4831204, at *28 (manipulation where, as here, "uneconomic trading strategies" were undertaken "in order to influence prices"), *aff'd* 364 Fed.Appx. at 661. From this long term uneconomic conduct, it may plausibly be inferred that JP Morgan intended to depress prices and was willing uneconomically to forego better sales prices in order to do so. From the foregoing acts and circumstances alone, manipulative intent may be inferred under *DiPlacido* or *PIMCO*.

**2. Motive and Opportunity.** Separately, why did JP Morgan engage in all of the foregoing non-hedging, non-bullion dealer, manipulator acts that depressed prices? Motive is another way to allege intent. *See In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 530 (S.D.N.Y. 2008 (intent may "be pled by 'alleging facts [] showing that the defendants had both motive and opportunity to commit the fraud"); *Kohen v. PIMCO*, 244 F.R.D. 469, 484-85 (N.D. Ill. 2007) (allegations that defendants' motive was to increase financial return was sufficient to allege manipulative intent). Plaintiffs allege that, unlike during the 2005-2007 period studied by the CFTC, which is a baseline, JP Morgan had during the Class Period a dominant short position. ¶¶68-69. This gave it a large financial motive to depress prices. ¶95. Indeed, JP Morgan had both the motive, ability, and the "opportunity" as used in *Amaranth*, 587 F.Supp.2d 513 (S.D.N.Y. 2008). This is because JP Morgan concedes (or still "declines to challenge") that it had the power to cause artificial prices. *Compare* Opp. *passim with* Opinion p. 19.

Therefore, JP Morgan consistently engaged in the highly unusual conduct of intentionally and uneconomically departing from standard bullion dealer and hedger conduct in order to depress COMEX silver prices and thereby increase the mark-to-market value of and otherwise

Case 1:11-md-02213-RPP   Document 144   Filed 02/19/13   Page 6 of 15

profit from its large dominant COMEX silver short position.  For this additional reason, Plaintiffs plausibly allege that JP Morgan intended to manipulate prices.  *See Amaranth*, 587 F.Supp.2d at 530; *Kohen v. PIMCO*, 244 F.R.D. at 484.

Plaintiffs respectfully submit that their detailed new allegations that JP Morgan intentionally and uneconomically departed from standard bullion dealer and hedger conduct in order to cause lower prices by transacting on the COMEX, now supplies what this Court found to be missing and what other courts have found sufficient to plead manipulative intent.[2]  These allegations are strongly reinforced by Plaintiffs' additional allegations of extraordinary motive and opportunity to manipulate. *See supra*.  Further, the attribution to JP Morgan of the large manipulative selling on June 26, 2007 by JP Morgan's floor broker Marcus Elias, who handled the trades, adds to the plausibility of the inference of manipulative intent.  *Compare* Opinion & Order (Dkt. No. 127) ("Opinion") p. 21 *with Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-699(1962) (in considering whether the totality of the circumstances proves its object, wiping the slate clean after each circumstance is un-sound because all circumstances should be considered together to see if the whole is greater than the sum of the parts).

Also adding to the plausibility of manipulative intent is that JP Morgan has been found to have misstated that it was engaged in hedging in other matters (¶137(u)), and the greatly increased clarity of the allegations that JP Morgan uneconomically caused depression of silver prices.  *Compare* "B" and "C" *infra with In re Soybeans Futures Litig.*, 892 F.Supp. 1025, 1045

---

[2] Plaintiffs acknowledge that they do not have emails or other admissions from a discovery type record.  *See* Opinion p. 21.  But other courts have found manipulative intent in the absence of such items, the CEA is to be liberally construed, and even under the strict Private Securities Litigation Reform Act ("PSLRA") pleading and scienter standards, the much more numerous securities complaints frequently survive dismissal motions where there are no emails or discovery type admissions alleged.  *Compare e.g. In re IPO Sec. Litig.*, 358 F.Supp.2d 189 (S.D.N.Y. 2004).

4

(N.D. Ill. 1995) (noting that some courts have recognized that the elements of manipulation are "factually and legally interdependent").

**B. Causation of Lower Prices.**  Contrary to Defendants, Plaintiffs have alleged in detail that JP Morgan, through its overwhelming holding of short COMEX futures and resulting impact on the reported short side concentration in the COMEX silver market, caused COMEX silver prices to be lower than they otherwise would have been during the Class Period.  ¶¶4(d), 60, 64, 66, 11, 114, 115, 137-139.  Indeed, Plaintiffs plausibly allege that JP Morgan caused COMEX silver futures prices to be artificially lower in numerous ways.  *See* No. "8" and "1"-"9" *generally* at pp. 2-3 *supra*.[3]

Contrary to Defendants' assertions that this Court has "rejected" gold as the best benchmark for silver prices (Def. Br. p. 14), this Court has not made omnibus or other fact findings.  Opinion, *passim*.  Rather, this Court has merely construed what was plausibly alleged in Plaintiffs' prior pleading—which Plaintiffs have now amended.  Plaintiffs have now competently alleged

(a) that platinum and palladium futures prices are improper benchmarks during March 2008 – 2010 because such prices were at the apex of an artificially high manipulation in March 2008 (¶87(f); see also *In re Platinum and Palladium Commodities Litigation*, No. 10 Civ. 3617 (S.D.N.Y.));

(b) generally speaking, gold has a higher statistical correlation to and explains much more of the changes in silver prices than does platinum (¶¶87(g)-(j));

(c) palladium has virtually no explanatory power whatsoever, according to the statistical work of a leading metals expert, Professor Christopher Gilbert (¶¶4(d), 87(f)-(j), 111(f), 137(y));

---

[3] Causation in a CEA manipulation claim is ordinarily an issue that is inappropriate even for summary judgment.  *In re Soybean Futures Litig.*, 892 F.Supp. 1025 (N.D. Ill. 1995); *Transnor (Bermuda) Ltd. v. BP North America Petroleum,* 738 F.Supp. 1472 (S.D.N.Y. 1990); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989).  Nonetheless, Plaintiffs alleged that Defendants caused artificial prices both by intentionally exploiting the vulnerability of the COMEX market to manipulation by large positions during 2008-2010 (*In re Abrams,* CFTC No. 88-10, 1995 WL 455791 at *6 (CFTC July 31, 1995) (exploiting or exacerbating a preexisting condition or vulnerability of the market, is a form of manipulation)) and by establishing large uneconomic positions and trades (*In re DiPlacido*, 2008 WL 4831204 at *30 (uneconomic trades found to cause artificial prices without need for expert testimony).

5

(d) as might be expected because gold and silver have historically served as currencies (whereas platinum and palladium have not), gold is the appropriate benchmark for silver in this situation (¶87(i));

(e) between 2008 – 2011, the London silver prices followed the COMEX prices between 92% and 100% of the time, depending on the year (¶137(d)); and

(f) even if gold were not generally the better predictor of silver prices, and it is, gold is the only un-manipulated benchmark for the Class Period (that did not follow the COMEX silver price leadership as London silver did).  ¶87(f)-(j).

In the foregoing context, Plaintiffs have alleged in detail that before and after the Class Period, the gold-silver ratio was much lower than during the Class Period.  *Compare* ¶¶87(a)-(j), 137(j) *with In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 87 (S.D.N.Y. 1998) (before, during and after comparisons are a standard measure of price impact and damages).  Further, Plaintiffs have alleged in detail that, during the Class Period, the gold-silver price ratio fluctuated directly with the degree of concentration on the short side of the silver market, *i.e.*, higher concentrations reduced silver prices relative to gold and thereby produced a higher gold-silver ratio.  *Compare* ¶137(j) *with Minpeco, S.A. v. Conticommodity Services, Inc.*, 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987) (denying broker's motion for summary judgment and noting that, under plaintiff's theory, "objective economic indicators such as the allegedly unusual pattern of silver spreads, silver price volatility, and non-proportionality of silver with gold prices must have alerted market professionals to the manipulation of the silver futures market.").[4]

Also, the timing of the increases in the gold-silver ratio correspond to the time before the CFTC public hearing on manipulation, when gold outperformed silver.  ¶130.  But then after the

---

[4] *In re Crude Oil Commodity Futures Litigation*, --- F.Supp.2d ---, 2012 WL 6645728 (S.D.N.Y. Dec. 21, 2010), citing *CFTC v. Parnon*, 2012 WL 1450443, at *12 (S.D.N.Y. 2012) ("In an instant, expensive near term crude became less valuable than crude deliverable in later months and long spread contracts lost nearly half of their value. These allegations make it at least plausible that the calendar spread prices did not reflect basic forces of supply and demand."); *In re Sumitomo Copper Litigation*, 182 F.R.D. 85, 90 and fn.6 (S.D.N.Y. 1998)("The courts look to a variety of factors in determining artificiality, such as historical price comparisons, an evaluation of supply and demand factors, comparison of spreads, and comparison to the cash market for the commodity at issue.") [citations omitted].

CFTC public hearing on manipulation and again after JP Morgan announced that it was closing its office where it traded London silver, silver rapidly outgained gold prices while JP Morgan's concentration in the COMEX silver market nose-dived. ¶¶3(d), 14, 87(a)-(f).

Moreover, the reported high concentration in the COMEX short silver interest, influenced market participants perceptions and behavior, and otherwise depressed prices). ¶137. Contrary to Defendants, Plaintiffs have now plausibly alleged that the movement of prices on June 26, 2007 and August 14-15, 2008 were contrary to the movement of prices in an ordinary competitive market and were indicative of price manipulation when compared with either gold, platinum or palladium prices (even though platinum and palladium prices do not have the explanatory power for silver prices that gold does). ¶¶60(a)-(h), 111(f)-(g).

Furthermore, the allegations of causation as to June 26, 2007 and August 14-15, 2008 are especially strong and include comparisons to gold, platinum, palladium as well as detailed further allegations.[5]

Plaintiffs respectfully submit that there are now multiple additional allegations relating to palladium, platinum, gold, London silver prices, statistical correlations, relative explanatory power, breakdowns of segments of time and price movements between March 25, 2010 or August 27, 2010 and the end of the Class Period, and all the other detailed statistical allegations

---

[5] With respect to June 26, 2007 and August 14-15, 2008 the CFTC Report did not address much less purport to provide the means of analyzing a daily trade manipulation. CFTC Report [Dkt. No. 140-6] *passim*. The CFTC Report expressly found that London silver followed COMEX silver by adjusting the following morning. CFTC Report, p. 7-8. Plaintiffs have plausibly alleged that the price discovery occurred on the COMEX which was the price leader (100% of the time for two years during the Class Period) and that London silver prices followed COMEX. Therefore, it is inappropriate and unrealistic to require Plaintiffs to allege that COMEX silver prices were not manipulated unless they deviated from London prices. Finally, the CFTC has warned that the cash-futures market relationship may not be indicative of whether there is a manipulation. *In re Cox*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,786, 1987 WL 106879, at *9 (CFTC Jul. 15, 1987) (quoting *Indiana Farm Bureau*, 1982 WL 30249, at *4, n.2).

relating to June 26, 2007 and August 14-15, 2008. These new allegations respond to and supply what this Court found to be missing with respect to causation. *See* Opinion pp. 30-34. Thus, Plaintiffs plausibly allege that JP Morgan caused COMEX silver prices to be lower than they otherwise would have been. ¶¶137(a)-(z).

**C. Artificial Prices.** Contrary to Defendants, artificial prices are shown by alleging movements in prices resulting from uneconomic conduct. *Indiana Farm Bureau Coop. Ass'n Inc.*, CFTC No. 75-14, 1982 WL 30249, at *4, n.2 (C.F.T.C. Dec. 17, 1982) ("[W]hen a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial"). Plaintiffs have now alleged in detail that JP Morgan engaged in large amounts of uneconomic conduct. ¶¶96-109, 121-128, 138; *see* "1"-"10" at pp. 2-3 *supra*. Plaintiffs have further alleged (*see* "causation" above), that this extensive conduct precisely caused the changes in the gold-silver ratio. As JP Morgan caused the concentration on the short side of the silver market to go up or down, the gold-silver ratio went up and down accordingly. ¶¶137(j)-(l), (t).

The more concentrated such COMEX silver short interest became, the lower that silver prices went in relationship to gold. ¶¶4(d), 60, 64, 66, 11, 114, 115, 137(j)-(m).

Based on the same new allegations described in the causation section, as well as the new much more detailed allegations of uneconomic conduct by JP Morgan, Plaintiffs respectfully submit that they have supplied in their Amended Complaint what this Court found to be earlier missing with respect to artificial prices. *See* Opinion pp. 24-30.[6]

---

[6] Artificial may be pled by alleging that observed prices were contemporaneously out-of-line compared to an appropriate benchmark (*Minpeco v. ContiCommodity Svcs., Inc.*, 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987)); changed substantially after the termination or reduction of Defendants' manipulative impact (*In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 87 (S.D.N.Y. 1998)); were produced by a supply and demand equation that included an illegitimate factor of supply or demand (*In re Anthony J. DiPlacido*, CFTC No. 01-23, 2008 WL 48312, at 30 (CFTC Nov. 5, 2008), *aff'd sub nom.*, *DiPlacido v. CFTC*, 364 Fed.Appx. 657, 661 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 1883 (2010); or were more volatile than usual (*Minpeco, S.A. v. Conticommodity Svcs., Inc.*, 552 F.Supp. 327 (S.D.N.Y. 1982)).

## II. Plaintiffs Plausibly Allege That Defendants Violated Section 2 Of The Sherman Act.

Without citation to a single authority, JPMorgan seeks to import the scienter pleading standard of a manipulation claim under Section 9(a) of the Commodity Exchange Act to Plaintiffs' Section 2 Sherman Act claim (Opp. at 19).  It is not surprising that JPMorgan fails to cite a case for this proposition given that no such requirement exists.  Indeed, it is well-settled that, in proving a violation of Section 2 of the Sherman Act, Plaintiffs are required to demonstrate ***either*** an intent to monopolize ***or*** an abuse of monopoly power.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966*)*; *General Motors Corporation v. City of New York*, 501 F.2d 639 (2d Cir. 1974).

Here, the proposed amended complaint alleges both JP Morgan's intent to manipulate the price of COMEX silver futures contracts (I.A. *supra*) as well as its abuse of monopoly power[7] in the market for COMEX silver futures contracts.  In that regard, the proposed amended complaint alleges that JP Morgan had the power to suppress COMEX silver futures prices, a fact which JP Morgan does not dispute, and did in fact suppress the prices of COMEX silver futures contracts by:  (1) acquiring a dominant concentrated short position in the Relevant Market (Complaint at ¶¶ 3, 51-53, 68-87, 96-128); (2) selling large amounts of COMEX silver futures contracts in a compressed time period, especially during illiquid*, i.e.*, low trading periods, (*id*. ¶¶ 4-6, 7, 52, 56-67); and (3) placing large spoof orders*, i.e.*, high volume orders in the market that were not

---

[7] JPMorgan also argues that the Proposed Amended Complaint fails to allege that it possessed monopoly power in the Relevant Market because Plaintiffs "fail to allege a single trade by JPMorgan that caused price movements." Opp, n.12. But significantly, as even JPMorgan concedes, "[m]arket power exists when a defendant '***can*** control prices or exclude competition.'" *Id*. (emphasis added) (quoting *PepsiCo., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-108 (2d Cir. 2002)).
 Notably, JPMorgan does not dispute Plaintiffs' allegations that it had the ability to manipulate the market, *i.e.*, control prices and exclude competition for Comex silver futures contracts.  *See* Opinion (citing JPMorgan Reply at 6, n.8, Dkt. 102)  (noting that "JPMorgan declines to challenge that it possessed the ability to influence market price"). JPMorgan cites no authority, presumably because there is none, for the proposition that Plaintiffs are required, at the pleading stage, to allege the specifics of JPMorgan's trades.  To the contrary,  Plaintiffs are not required at the pleading stage to specify the "who, what, when, where and  how" of a defendant's Sherman Act violation.  *Polyurethane Foam Litig*, 799 F. Supp. 2d 777, 794 (N.D. Ohio 2011).

9

intended to be executed (*id*. ¶¶ 4-6, 7, 52, 56-57).  Such market controlling activity in the COMEX silver futures market are further specific allegations of JPMorgan's market power.  This is more than is required at the pleading stage.

### III. JP Morgan Fails To Carry Its Non-Movant Burden By Failing To Identify Any Prejudice Resulting From Plaintiffs' Proposed Amendment.

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Associates*, 988 F.2d 344, 350 (2d Cir. 1993).  Mere delay is insufficient. *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).  If no undue prejudice will result from amendment, it should be allowed. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 330-331 (1971).  Defendants merely state in a conclusory fashion that Plaintiffs' amendments will cause prejudice.  Opp. at 2.  This fails to assert, let alone show, that any arguments, witnesses or documents have been lost by JP Morgan due to the timing of this amendment, or any other prejudice let alone any "undue prejudice". *See e.g.*, *Ansam Associates, Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985); *Block v. First Blood Associates*, 988 F.2d 344, 351 (2d Cir. 1993).

**Conclusion.**  Leave to amend should be granted.

Dated: New York, New York
       February 19, 2013

Respectfully submitted,

**LOVELL STEWART HALEBIAN JACOBSON LLP**
By: */s/ Christopher Lovell*
Christopher Lovell
Christopher M. McGrath
Amanda N. Miller
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

10

(212) 719-4677 (fax)

*Interim Lead Class Counsel*

**LABATON SUCHAROW LLP**
Bernard Persky
Hollis Salzman
Kellie Lerner
William V. Reiss
140 Broadway
New York, New York 10005
(212) 907-0700

*Member, Interim Plaintiffs' Steering Committee*

**LOWEY DANNENBERG COHEN & HART, P.C.**
Vincent Briganti
Geoffrey Horn
One North Broadway
White Plains Plaza, 5th Floor
New York, New York 10601
(914) 997-0500

*Member, Interim Plaintiffs' Steering Committee*

**HAUSFELD LLP**
William Butterfield
Ralph Bunche
1700 K Street N.W., Suite 650
Washington, D.C. 20006
(202) 540-7200

*Member, Interim Plaintiffs' Steering Committee*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
J. Douglas Richards
Michael Eisenkraft
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Member, Interim Plaintiffs' Steering Committee*

**KIRBY McINERNEY LLP**
David Kovel
825 Third Avenue, 16th Floor

New York, NY 10022
Tel: 212.317.2300

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 8th Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292

Michael M. Buchman
**POMERANTZ HAUDEK GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, NY 10017
(212) 661-1100

Robert Kaplan
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Samuel J. Lieberman
**SADIS & GOLDBERG LLP**
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164

Linda Nussbaum
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis MN  55401
612-339-6900

Robert S. Schachter
Stephen L. Brodsky
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY  10010
(800) 721-3900

Jeffrey A. Klafter
**KLAFTER, OLSEN & LESSER, LLP**
Two International Drive, Ste. 350
Rye Brook, New York 10573
(914) 934-9220

Louis F. Burke
**Louis F. Burke P.C.**
460 Park Avenue, 21st Floor
New York, New York 10022

Bruce L. Simon
George S. Trevor
**PEARSON SIMON WARSHAW PENNY, LLP**
44 Montgomery St., Suite 2450
San Francisco, California 94104
(415) 433-9000

Peggy J. Wedgworth
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York 10119

Jeffrey Squire
**BRAGAR WEXLER EAGEL & SQUIRE**
885 Third Avenue, Ste. 3040
New York, New York 10022
*Additional Plaintiffs' Counsel*